THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUSTIN FENDER, Defendant-Appellant.

Fifth District    No. 5—00—0227

Opinion filed September 27, 2001.

Daniel M. Kirwan and Janet Gandy Fowler, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Alan Buck, State's Attorney, of Louisville (Norbert J. Goetten, Stephen E. Norris, and Patrick D. Daly, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HOPKINS delivered the opinion of the court:

Justin Fender (defendant) appeals from his conviction of the offense of armed robbery (720 ILCS 5/18—2 (West 1998)). On November 5, 1999, defendant was sentenced to 16 years' imprisonment. As a part of the sentencing, the trial court found that the victim of the armed robbery had suffered great bodily harm, and as a result, the court ordered defendant to serve 85% of his 16-year prison sentence, pursuant to section 3—6—3(a)(2)(iii) of the Unified Code of Corrections (730 ILCS 5/3—6—3(a)(2)(iii) (West 1998)). On appeal, defendant argues (1) that he was denied a fair trial because the trial court improperly admitted details about defendant's attempted solicitation to kill a crucial State witness and (2) that the statutory provision under which defendant is required to serve 85% of his term of imprisonment is unconstitutional under the United States Supreme

Court decision in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). We affirm.

## I. FACTS

The evidence presented at defendant's jury trial was as follows. During the evening of March 1, 1999, Elizabeth Pearce was the only employee working at Zink's convenience store in Louisville, Illinois. A customer, Sherry Garner, testified that as she was coming out of Zink's to leave at about 9:15 that evening, she noticed a person of slender build walking south toward Zink's parking lot. Garner testified that she remembered the person because he seemed odd to her. According to Garner, the person she saw was dressed in dark clothing with a hooded shirt pulled over his head. Garner testified that when the person became aware that she was looking at him, he stepped out of sight behind a vehicle. Garner was not asked to identify defendant at the trial.

The clerk, Elizabeth Pearce, testified that the store's closing time was 10 p.m. About 9:45 p.m. on March 1, 1999, as she was standing at the cash register, a man came in and pointed a gun at her. Pearce described the gun as a revolver. The person holding the gun was shorter than she and was dressed in black, wearing a black, hooded sweatshirt with the hood pulled over his head. He was wearing dark sunglasses and a bandana over his mouth. Pearce testified that the only parts of the robber's face that she could see were his temples, but from that she knew he was a white person. Pearce testified that as the robber pointed the gun at her, he said, "Open the f------ drawer or I'll blow your f------ head off." Pearce testified that when the robber spoke, she knew that the robber was a man.

Pearce testified that before she had time to open the cash register drawer, the robber said, "Get me a bag, get me a bag." She testified that as she turned away to retrieve the bag for him, the robber said: "No, no, no. Open the drawer. Open the drawer first." Pearce testified that she then turned back to the cash register and opened the drawer, and immediately after the drawer was opened, the robber took out the money tray and began grabbing the money. Pearce testified that she turned away to get a bank bag for the robber, unzipped the bag, and asked the robber if he wanted her to help him. Pearce testified that the robber yelled: "No, no. Get on the floor. Get on the floor."

Pearce testified that she complied with the robber's order by bending down to lie on the floor, and as she did, the robber hit her on the head with the butt of his gun. When the gun hit her, it cut her head open. Immediately after being hit, Pearce put her hand to her head, and as she did, the robber hit her again, breaking one finger and cut-

ting another. Pearce testified that after being hit the second time, all she could do was lay on the floor. The robber left within a few seconds.

Bridgett Lane testified that defendant was her boyfriend, beginning about February 1999. Lane testified that on March 1, 1999, defendant was living at the Motel 45 in Louisville, Illinois. Lane and her 16-month-old daughter were with defendant in his motel room at about 4:30 p.m. that day. Lane testified that she and defendant watched television and played with the baby but that defendant was also pacing the floors "a little bit." Lane testified that after a while, defendant said that he was going to rob Zink's, but Lane did not believe him.

According to Lane, defendant took a shower and put on a pair of black pants. Lane testified that defendant cleaned his gun, loaded it with bullets, and put on a black, hooded sweatshirt and a pair of black tennis shoes. Lane testified that she had never seen the tennis shoes before, and defendant held them up to her and said that he was going to wear them so that he could throw them away in case it was muddy so that the police would not be able to trace the footprints back to him. Lane testified that after defendant got dressed, he placed a bandana over his head, placed another bandana over his nose and mouth, and put on sunglasses. Defendant also put two pairs of white hospital gloves on his hands. Lane testified that at about 9:45 p.m., defendant put the gun, which she described as a black handgun with a brown handle, into the pocket on the front of the sweatshirt and left the motel. Lane testified that defendant came back to the motel room after about five minutes, saying that there were too many people at Zink's to "do it." During her testimony, Lane identified the shoes that defendant wore that night and the gun that he carried.

After coming back to the motel, defendant left again after a few minutes. Lane testified that defendant was still wearing the same outfit. After defendant left the second time, Lane continued to watch television and tried to get her daughter to sleep. She testified that defendant returned the second time after about 10 to 15 minutes. Lane testified that when he came back, "[He was] out of breath and just real nervous and everything[,] and he just[—]he threw the money on the floor." Lane testified that the money was in a brown bank bag and that defendant estimated that he got about $500 in the robbery. According to Lane, defendant took off the bandanas, the sunglasses, and the sweatshirt, put those items into a bag, walked out the door, and threw the bag into the motel dumpster. Lane testified that defendant also took off the tennis shoes and put on a pair of boots and a black T-shirt. Lane testified that when defendant came back into the motel room, he picked up the tennis shoes and told her that they had to get

out of there. Lane, her baby, and defendant got into the car with the tennis shoes and the money bag and left the motel.

Lane testified that as they were driving away from the motel, there was a car behind them that defendant thought was a police car. According to Lane, the car turned around and followed them, and as the car followed them, defendant pitched the tennis shoes out the window and over the top of the car onto Lane's side of the road. Eventually, the police car stopped following them, and they went to defendant's parents' home. While there, defendant went inside, but Lane stayed in the car. Defendant returned to the car after about 15 minutes. Lane testified that she and defendant left and went to the Casey's gas station in Louisville and put gas into the car.

Lane testified that they left Casey's and went back to the motel, but when they got there, defendant drove past when he saw police cars at the motel. According to Lane, about five minutes later, they again drove to the motel, and the police were still there. Lane testified that defendant said that the police knew it was him but that there was nothing he could do about it then. Lane testified that defendant pulled into the parking lot of the motel, got out, and talked to one of the police officers who was in front of defendant's room.

Lane testified that she eventually told the law enforcement officials what she knew about the robbery but that she waited for nearly two weeks before coming forward. Lane explained that she did not come forward earlier because she and her husband, J.R. Dalton, were trying to work things out and because defendant told her that if she and defendant ever broke up, defendant would kill her because she knew about the robbery. Lane testified that defendant made these threats to her both before and after the robbery. Lane testified that the first time he threatened only her, but after the robbery, he threatened both her and her daughter. Lane testified that she eventually told what she knew despite defendant's threats because "what he done to that girl wasn't right."

On cross-examination, Lane continued to assert that defendant threatened to kill both her and her baby, despite defense counsel's repeated questions about Lane's relationship with her husband, why she did not tell about the robbery earlier, why Lane did not leave the motel when defendant left to commit the robbery, and why Lane did not leave the car when defendant went inside his parents' house.

Defendant admits in his brief to this court that several witnesses testified that on March 1, 1999, between 9:15 and 9:45 p.m., they observed a man walking in the vicinity of Zink's convenience store and they described him as between 5 feet 5 inches tall and 5 feet 9 inches tall, wearing a dark, hooded sweatshirt, black pants, and sunglasses.

Kelly Greenman testified that during the evening hours on March 1, 1999, she was working at Casey's gas station. When she heard about the robbery at Zink's, which is located about three blocks from Casey's, she locked the doors to the station. About 20 or 30 minutes after hearing about the Zink's robbery, defendant came to the station to purchase gas. Greenman unlocked the door to the station when defendant arrived because she knew him. Greenman testified that defendant was wearing jeans and a tank top when she saw him. Greenman testified that she told defendant about the robbery at Zink's and that defendant appeared normal, not excited. Greenman testified that defendant said he was going out partying.

Clay County Sheriff Lee Ryker testified that Lane talked to him on March 13, 1999, and told him that she and defendant were driving down Vandalia Road in Louisville, Illinois, after the Zink's robbery and that defendant threw the shoes he wore during the robbery out of the window. Based upon Lane's statements, Sheriff Ryker drove to the area and found the shoes. Sheriff Ryker identified the black tennis shoes he found on the side of Vandalia Road.

Clay County Deputy Sheriff Guy Durre testified that on March 14, 1999, he questioned defendant about the robbery. Durre showed defendant the black shoes recovered from the side of Vandalia Road, but defendant told Durre that the shoes did not belong to him. Defendant tried on the shoes and complained that they were too tight. Durre also showed defendant a gun recovered from Scott Jones, a friend of defendant's. Jones testified that shortly after the Zink's robbery defendant traded him the gun in exchange for a buck knife that belonged to Jones. According to Durre, defendant admitted that the gun had been his before he traded it to Jones. Both defendant and Jones testified that they commonly traded items such as guns and knives.

James Michael Welty testified that he shared a cell with defendant shortly after defendant's arrest. Welty admitted that he had several prior convictions, the most recent in 1998 for felony theft. Welty testified that while he and defendant shared the cell, defendant "kind of made an offer" that he would pay someone to "take care of Bridgett and her daughter." Welty testified that he interpreted defendant's remark as meaning defendant wanted someone to kill Lane and her daughter. Welty initially testified that defendant never used the term "kill." Welty later testified that defendant said that if defendant had the chance, even 10 years later, defendant was going to see to it that he got Lane and her daughter killed. Welty also testified that defendant told him that he threw the black tennis shoes that he wore during the robbery out of the car window. Welty admitted that defendant never told him he committed the robbery and that defendant merely

expressed concern about the fact that the Clay County sheriff's department had his tennis shoes in their possession.

Defendant testified about his employment in the months leading up to March 1, 1999. He testified that in the week before March 1, 1999, he picked up two paychecks worth a total of almost $400 and that he received another paycheck worth $50 to $60 shortly after that. Defendant testified that sometime in February 1999, he sold a car for $300, and his sister gave him $200 from her income tax refund. Defendant identified the black tennis shoes that Sheriff Ryker recovered from the side of Vandalia Road, and he admitted that he used to own a pair similar to them. Defendant testified that he did not know if those shoes belonged to him, but he was curious, if they were his, how the sheriff got his tennis shoes. Defendant identified the gun recovered from Scott Jones as having belonged to him before he traded it to Jones. Defendant admitted that he had that gun and some ammunition in his possession at his room at Motel 45 on March 1, 1999. Defendant testified that he had the gun with him as protection from J.R. Dalton, Lane's husband.

Defendant testified that he did not commit the Zink's robbery. Defendant testified that he and Lane and Lane's daughter were at the motel room from about 5 p.m. on March 1, 1999, until about 9:30 p.m., when they left to go to defendant's parents' home. Defendant testified that he went to his parents' home to get a video game to play. Defendant testified that after leaving his parents' house, he stopped at Casey's gas station. Defendant testified he left Casey's and went back to his parents' home to warn them about the Zink's robbery, that the robber had a gun, and that the robber was "still out there." Defendant testified that after they left his parents' home the second time, they drove around for a while trying to get the baby to sleep. Defendant testified that when they arrived back at the motel, police cars were parked close to his room. Defendant testified that he parked next to one police car and spoke to the officer briefly.

Defendant testified that he and Lane remained together most of the time for the next couple of days but that he broke up with her around March 3, 1999, because he wanted to get back together with his former girlfriend. Lane testified that she broke off the relationship with defendant because she wanted to work things out with her husband. Defendant testified that he let Lane stay in his room the night they broke up and that he took her to her grandfather's house the next day, came back, and retrieved his belongings. Defendant testified that he did not owe any money for rent when he moved out. The motel manager testified that defendant owed 16 days of rent, $166, when he left and that he told defendant that he needed the money the weekend before the robbery.

## II. ANALYSIS

### A. Admission of Details About Other Crimes

■ Defendant contends that the trial court's improper admission of testimony about his alleged attempted solicitation of the murder of Lane, a key prosecution witness, and her daughter was highly prejudicial and destroyed his right to a fair trial. Defendant argues that Lane was the most critical witness for the State and that without her testimony identifying defendant as the robber, the State's case was almost entirely circumstantial. Defendant does *not* argue that Lane's testimony about defendant's threats was improper. Defendant admits that Welty's testimony—that defendant asked him to "take care of" Lane and her daughter—was admissible to establish consciousness of guilt, but defendant claims that the trial court allowed in too much detail to serve this limited purpose, the extra details serving merely to inflame the jury unfairly against defendant. Evidence that a defendant committed a crime other than the one for which he is charged is inadmissible for the purpose of showing the defendant's propensity to commit crimes in general; however, it may be admitted if relevant for any other purpose. *People v. Robinson*, 167 Ill. 2d 53, 62 (1995). The principal requirement is that the evidence be relevant and not unduly prejudicial. *People v. Cloutier*, 156 Ill. 2d 483, 505 (1993).

■ The State counters that defendant has waived this issue due to his failure to object to it at the trial and his failure to raise the issue in a posttrial motion. The State is correct that defendant has waived this issue. Without a contemporaneous objection to evidence as it is being admitted and without a posttrial motion raising the issue in the trial court, a defendant has no basis for a review of that issue on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). This rule is of particular importance in a case such as this where defendant admits that at least a portion of the evidence was properly admitted. Without an objection at the trial to the improper portion of the evidence, it is virtually impossible to decide at the appellate-review stage which details unfairly prejudiced defendant.

Defendant suggests in his brief that the details about the solicitation to murder Lane might have been proper, but not those about Lane's daughter. Defendant also suggests that we should avoid employing the waiver rule by finding that the admission of the other-crimes evidence amounts to plain error under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)). However, the plain error rule is to be applied only if the evidence is closely balanced or if the error is of such magnitude that there is a substantial risk that defendant was denied a fair trial. *People v. Nielson*, 187 Ill. 2d 271, 297 (1999). We do not find the plain error doctrine applicable to the facts of this case.

The evidence in this case was not closely balanced, even if the evidence of which defendant complains is not weighed in that balance. The jury was presented with ample evidence that defendant robbed Zink's convenience store on March 1, 1999. Lane testified that defendant was the robber. The clerk and several other witnesses corroborated Lane's testimony with descriptions of the robber that fit defendant's height and build. Defendant admitted that on March 1, 1999, he kept a gun with ammunition at the motel where he was staying, which is located within easy walking distance from Zink's. Several witnesses identified the gun used in the robbery, and defendant acknowledged at the trial that the gun admitted into evidence had been his before he traded it to Jones.

Second, the error about which defendant complains is not so substantial that it might have deprived defendant of a fair trial. The State called a total of 31 witnesses, and Welty's testimony was the last during the State's case in chief. Welty's entire testimony was brief, including his testimony recalling defendant's attempt to solicit murder. The only details that defendant challenges as inadmissible are Welty's statements that defendant wanted "to take care of" not only Lane but also her daughter. The trial court would have been well within its discretion to deny such a defense motion or objection on the basis that Welty's testimony was relevant to show defendant's consciousness of guilt. See *People v. Millighan*, 265 Ill. App. 3d 967, 972-73 (1994). The trial court could also have found that the State should be allowed the opportunity to corroborate Lane's statements about defendant's threats, particularly since defendant's attorney questioned Lane extensively during cross-examination about these threats. "Illinois courts have long held that an accused cannot complain of the admission of testimony that was invited by the defendant's own tactics at trial." *People v. Topps*, 293 Ill. App. 3d 39, 48 (1997).

Defendant makes one final attempt to salvage this issue by claiming ineffective assistance of counsel based upon his attorney's failure to preserve this issue for appeal. Our review of the record reveals that defense counsel did not fail to object but, rather, chose a trial strategy of using defendant's alleged threats against Lane to call Lane's credibility into question. Defendant's attorney began her cross-examination of Lane by asking why Lane did not leave defendant at several different opportunities and why she did not go to the police with her information for almost two weeks after the crime if she was so afraid of defendant for making these threats against her and her daughter. After Lane's testimony about defendant's threats, Welty's testimony was largely cumulative. Again, defense counsel did not fail to object to this

testimony but used it as a part of her trial strategy that concentrated on the incredibility and untrustworthiness of both Lane and Welty. The decision whether to object to testimony is generally a matter of trial strategy that is entitled to great deference and does not amount to ineffective assistance. *People v. Troutt*, 172 Ill. App. 3d 668, 672 (1988). Here, the conduct about which defendant complains is a matter of trial strategy, and defendant has shown no prejudice as a result of his attorney's representation. Therefore, defendant's ineffective-assistance-of-counsel argument fails.

Thus, we find that the doctrine of plain error does not apply to defendant's assertion of error in the admission of other-crimes evidence, that defendant was not deprived of the effective assistance of counsel, and that defendant has waived our review of this issue.

## B. Application of *Apprendi*

Defendant was convicted of armed robbery, a conviction that requires the sentencing judge to "make a finding as to whether the conduct leading to conviction for the offense resulted in great bodily harm to a victim[ ] and *** enter that finding and the basis for that finding in the record." 730 ILCS 5/5—4—1(c—1) (West 1998). Under a separate section of the Unified Code of Corrections (the Unified Code), the Department of Corrections is required to "prescribe rules and regulations for the early release on account of good conduct" of those incarcerated. 730 ILCS 5/3—6—3(a)(1) (West 1998). When a defendant is convicted of armed robbery and the trial court makes the finding that the conduct leading to that conviction resulted in great bodily harm to a victim, then the Department of Corrections is allowed to give that prisoner "no more than 4.5 days of good[-]conduct credit for each month of his or her sentence of imprisonment." 730 ILCS 5/3—6—3(a)(2)(iii) (West 1998). In this case, the trial court made the finding that the victim of defendant's armed robbery suffered great bodily harm, the result of which is that the Department of Corrections may not give defendant more than 4.5 days of good-conduct credit per month. In other words, defendant is required to serve 85% of his 16-year sentence.

Defendant claims that this statutory scheme is unconstitutional under the recent United States Supreme Court decision in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). In *Apprendi*, the Court invalidated a New Jersey statute that permitted a sentencing judge to enhance a defendant's sentence beyond the prescribed statutory maximum if the judge found by a preponderance of the evidence that the crime was committed with a racially biased motive. The effect of the sentencing scheme at issue in *Apprendi* was

to elevate the defendant's sentence, which would have been between 5 and 10 years' imprisonment without the judge's finding, to between 10 and 20 years' imprisonment with the finding. *Apprendi*, 530 U.S. at 468-69, 147 L. Ed. 2d at 442, 120 S. Ct. at 2351. The Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime *beyond the prescribed statutory maximum* must be submitted to a jury[ ] and proved beyond a reasonable doubt." (Emphasis added.) *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. After discussing the historical foundation for the ruling, the Court acknowledged that it was not suggesting that it was "impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute." (Emphasis in original.) *Apprendi*, 530 U.S. at 481, 147 L. Ed. 2d at 449, 120 S. Ct. at 2358.

■ In the instant case, defendant argues that the statutory scheme under which he was sentenced is unconstitutional under the rules set forth in *Apprendi* because the length of time he is to serve in prison was heightened by the judge's finding of great bodily harm. This argument must fail. Whether defendant serves all or part of the 16-year term of imprisonment to which he was sentenced, that term will not be in excess of the prescribed maximum penalty for armed robbery, a Class X felony (720 ILCS 5/18—2(b) (West 1998)). Nothing in *Apprendi* constrains the legislature's ability to define the manner in which a sentence imposed within the statutory range must be served.

The rationale upon which the *Apprendi* decision is based negates defendant's argument. The Court in *Apprendi* explained its decision in part based upon its prior decision in *McMillan v. Pennsylvania*, 477 U.S. 79, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986). In *McMillan*, the defendant challenged Pennsylvania's Mandatory Minimum Sentencing Act as violating his sixth amendment right to a jury trial. *McMillan*, 477 U.S. at 80, 91 L. Ed. 2d at 73, 106 S. Ct. at 2413. That act requires sentencing judges to impose a minimum sentence of five years' imprisonment for certain enumerated felonies if the judge finds, by a preponderance of the evidence, that the defendant visibly possessed a firearm during the commission of the offense. *McMillan*, 477 U.S. at 81-82, 91 L. Ed. 2d at 73, 106 S. Ct. at 2413. The Court in *McMillan* noted, "The [Pennsylvania Mandatory Minimum Sentencing] Act operates to divest the judge of discretion to impose any sentence of less than five years for the underlying felony; it does not authorize a sentence in excess of that otherwise allowed for that offense." *McMillan*, 477 U.S. at 81-82, 91 L. Ed. 2d at 73, 106 S. Ct. at 2413-14.

The Court in *Apprendi* noted that the sentencing scheme reviewed

in *McMillan* remained constitutional under its analysis in *Apprendi*. We find that the statutory scheme at issue in the case at bar is similar to the sentencing scheme found to be constitutional in *McMillan* and again in *Apprendi*. In *McMillan*, the sentencing scheme provided for a mandatory minimum sentence of five years. In the case at bar, the statutory scheme provides for a mandatory minimum sentence of 85% of defendant's term of incarceration. Just as in *McMillan*, the statutory scheme under which defendant is required to serve a minimum portion of his term of imprisonment " 'neither alters the maximum penalty for the crime committed nor creates a separate offense calling for a separate penalty; it operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it without the special finding.' " *Apprendi*, 530 U.S. at 486, 147 L. Ed. 2d at 452-53, 120 S. Ct. at 2361, quoting *McMillan*, 477 U.S. at 87-88, 91 L. Ed. 2d at 77, 106 S. Ct. at 2417.

We follow the rulings of the United States Supreme Court in *Mc-Millan* and *Apprendi* and hold that the statutory scheme under which defendant is eligible for no more than 4.5 days of good-conduct credit per month is constitutional. We also follow the Fourth District Appellate Court's decision in *People v. Garry*, 323 Ill. App. 3d 292, 752 N.E.2d 1244 (2001), wherein the court held that *Apprendi* concerns are not implicated by section 3—6—3(a)(2)(iii) of the Unified Code. *Garry*, 323 Ill. App. 3d at 299, 752 N.E.2d at 1250.

## III. CONCLUSION

For all of the reasons stated, we affirm defendant's conviction and sentence.

Affirmed.

GOLDENHERSH and RARICK, JJ., concur.