FIFTH DIVISION

   June 28, 2002 

No. 1-99-4294

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

DEMETRIUS CUNNINGHAM,

Defendant-Appellant.

))))) ))))

Appeal from the

Circuit Court of

Cook County

Honorable

Lon Schultz,

Judge Presiding.

JUSTICE QUINN delivered the opinion of the court:

Following a jury trial, defendant, Demetrius Cunningham, was convicted of first degree murder, aggravated kidnaping, robbery and aggravated vehicular hijacking.  Defendant was 15 years old at the time the incident occurred.  Defendant was sentenced to 80 years for first degree murder, 30 years for aggravated vehicular hijacking, 15 years for aggravated kidnaping and 7 years for robbery.  The sentences were ordered to run concurrently.  Defendant now timely appeals.

On appeal defendant argues that his convictions should be reversed where: (1) he was arrested without probable cause; (2) his confession should have been suppressed; and (3) he was not proven guilty beyond a reasonable doubt; and the trial court erred: (4) in permitting a witness to identify him in court; (5) in denying his objection to hearsay; (6) in denying his motion to bar the State's footprint expert's testimony; (7) in permitting the State's footprint expert to testify regarding his statistical theory; and (8) in failing to order a mistrial when a detective deliberately violated a court order.  Finally, defendant claims that the prosecutor's comments during closing arguments and rebuttal deprived him of a fair trial.  Also, in a supplemental brief, defendant argues that his extended-term sentence violates 
Apprendi v. New Jersey
, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

We will discuss the issues relating to defendant's confession and the testimony of the State's footprint expert in this opinion.  All other issues will be discussed in a Rule 23 (166 Ill. 2d R. 23)  order issued contemporaneously with this opinion.  For the reasons that follow, we affirm defendant's convictions and sentence. 

I.  STATEMENT OF FACTS

On November 23, 1994, Elsie Orlinsky, the 80-year-old victim, was abducted in her 1992 Oldsmobile Delta from the Walgreen's parking lot on 55th Street and Lake Park Avenue in Chicago.  Later that afternoon, her body was found at the 63rd Street beach.  The victim's car was not found at the scene.

A. State's Case In Chief

Chicago police evidence technician Thomas Reynolds testified that on November 23, 1994, he processed the crime scene.  Reynolds testified that the victim's head was bloody.  Near the body, Reynolds observed a walking cane broken into three pieces, some blood on the bottom of a 55-gallon drum that was near the victim's head and impressions of shoeprints near the body.  No fingerprints could be lifted from the drum because the surface was unsuitable.  Reynolds photographed the scene, the victim and the footprint impressions.

Richard Rubin testified that on November 23, 1994, he was a detective with the Chicago police department who drew composite sketches.   Rubin met with a witness, Jose Lopez, who provided him with information from which he generated a composite of the alleged offender in this case.

Jose Lopez testified that on November 23 he was making a delivery in the Hyde Park area.  Lopez said that while stopped at a stop sign at 53rd and Kimbark Street, he saw a late model Oldsmobile pull into the intersection.  The car, which was 15 feet away, stopped in front of Lopez for approximately 10 seconds.  Lopez testified that later that evening, after seeing a story about the murder on the news, he contacted the police and described the driver of the car.  Lopez viewed a lineup at Area 2 but told detectives he was unable to identify the man he saw in the car that day.  When asked which of the men most resembled the man he saw, Lopez identified a man in the lineup named James Pugh.  On approximately December 15, 1994, Lopez was shown a photograph array which included a photograph of the defendant.  Lopez said he was unable to identify the driver of the car from the photographs.  A few days later Lopez was shown another photograph array which included a picture of the defendant.  Lopez said that if you put glasses and a mustache on the defendant, "he looks just like him (the offender), he's got that same goofy look."

Donald Sebastian testified that he is the assistant principal of the Mt. Carmel High School.  Sebastian testified that the beach area of 64th Street and the lakefront was approximately one mile east of the school.  Sebastian testified that on November 23, 1994, the school day was shortened from 8:30 a.m. to 12:05 p.m. as it was the day before Thanksgiving.  Mt. Carmel's attendance records indicated that defendant was present in school that day.

Gregory Talbert testified that on November 23, 1994, he was walking across the intersection of 55th Street and Lake Park Street.  He saw a green Oldsmobile speeding south on Lake Park, come skidding to a stop, and almost hit him.  Talbert said he looked inside the car and saw a white, older lady pressed up against the glass of the window.  He saw the man on the driver side grab the lady, put her in a head lock and punch her until she was unconscious.  Approximately five to seven seconds elapsed until the car pulled away.  Talbert viewed a lineup in early December of 1994 and positively identified James Pugh as the driver of the car.  In October of 1998, Talbert was shown a photograph of the original lineup and again identified Pugh.  At trial, Talbert testified that he was now only 40% sure that the man he identified in the lineup was the driver of the car.

Douglas Heilman testified that he was a special agent with the Federal Bureau of Investigation (FBI) in Chicago on November 23, 1994, assigned to a carjacking homicide.  On December 12, 1994, he processed the victim's Oldsmobile for evidence.  Thirty-three  fingerprints were lifted from the car.  Ten fingerprints and one palmprint matched the prints of Lamont Borom.  None of the fingerprints recovered matched those of James Pugh or defendant.  In addition, a black and yellow screwdriver was recovered from the car.  Heilman testified that on December 14 he executed a search warrant at defendant's home and recovered five pairs of tennis shoes and a nylon jacket. 

Theodius Jackson testified that on November 25, 1994, he was standing on a street in East Chicago, Indiana, when defendant and  his brother, Jason Cunningham, pulled up in a new-looking car.  When he asked where they got the car, defendant responded that he bought it from his uncle in Chicago for $500.  Jackson saw Indiana plates on the car on that date.  A few days later, Jackson again saw defendant.  Defendant said he was meeting Lamont Borom because Lamont was using the car.  Jackson testified that he again asked defendant where he got the car and defendant said he hit an old white lady and took her car.  Jackson further testified that on the evening of December 1, 1994, he was riding around in the Oldsmobile with defendant and Lamont.  Jackson said that defendant again told him that he hit an old white lady and took her car "by the Loop."  When questioned where "the Loop" was, defendant said it was on the other side of Mt. Carmel.  Defendant told Jackson he took the lady's purse, $10 and her keys.  While riding in the car that night, defendant took a screwdriver out of the armrest and began scraping a handicap sticker off the window.  Jackson stated that defendant had a light mustache in November of 1994 and looked basically the same now as he did when the incident occurred.  

Lamont Borom testified that around Thanksgiving of 1994 he saw defendant and his brother in a green Oldsmobile.  Borom said that the defendant told him he got the car from a dope-dealing uncle in Alabama for $500.  Borom testified that a week later he drove the car with Jackson and defendant riding as passengers.  When Jackson questioned defendant as to where he got the car, defendant said he hit an old white lady "in the Loop" and dragged her out of the car.  Defendant said he took her purse, $10 and keys to her car.  Borom was driving the car on December 12, 1994, with Jackson when they were pulled over by a police car and arrested.  Borom testified that defendant allowed him to keep possession of the car as long as he picked defendant up from school.

Dr. Edmund Donoghue testified that he is the chief medical examiner for Cook County.  Donoghue conducted the postmortem examination of the victim, Elsie Orlinsky.  The examination revealed multiple injuries to the head and face including a skull fracture and subgaleal hemorrhage.  In addition, the victim's body had injuries consistent with being defensive injuries. Donoghue concluded that the injuries observed on the victim were consistent with the victim having been struck by a cane and a 55-gallon drum and that she died as a result of blunt trauma.

Assistant State's Attorney (ASA) Peter Faraci testified that on December 12, 1994, he interviewed defendant in the presence of his father.  ASA Faraci said that defendant told him that in November of that year he had left school and was walking to the train station when a man pulled up in a vehicle at 63rd Street and Dorchester Avenue and asked him if he wanted the car.  Defendant said that he looked in the car to see if there was any blood, and once he determined that there was nothing wrong with the car he said he would take it.  Defendant told ASA Faraci that he took the car, replaced the license plates and drove back to Indiana.  Defendant said that he could identify the man who gave him the car.  ASA Faraci asked defendant's father to bring him back to the station on December 14.  

Chicago police detective Michael Baker testified that on December 12, 1994, he received a call from the East Chicago police department that a car taken in a Chicago homicide had been recovered.  Baker proceeded to the station in Indiana and interviewed defendant.  Defendant's parents were present at the station.  Baker said that defendant told him that he was walking in the vicinity of 61st Street and Dorchester Avenue at around 4 p.m. on November 23 when a man pulled up in a car.  Defendant said the man offered the car and he took it, driving it to Indiana, where he changed the license plates.  Defendant said that he was watching the news on Thanksgiving Day when he saw a news story about a carjacking and murder.  A composite sketch of the alleged offender was part of the story.  Baker showed defendant the composite sketch of the offender and defendant said it had a strong resemblance to the man who gave him the car.  Baker testified that at that time he took defendant to the area of 61st Street and Dorchester so that he could identify where he got the car.  

Baker then took defendant back to Area 2, where ASA Faraci spoke with defendant briefly.  Baker then requested that, due to the late hour, defendant's parents bring him back to the station on December 14 because they had a suspect, James Pugh, in custody and they wanted defendant to identify him. 

Baker testified that on December 14 the defendant and his father returned to Area 2.  Defendant viewed a lineup containing James Pugh but was unable to identify anyone as the man who gave him the car.  Baker said that defendant was then brought into an interview room alone.  During the motion to suppress, Baker testified that defendant's father did not request to have an attorney present, nor did defendant request an attorney.  Although defendant's father was present at the station, he was not present in the interview room.  Baker confronted defendant with the statements obtained from Borom and Jackson.  Defendant said that he wanted to tell the truth.  At that point, Baker said he advised defendant of his 
Miranda
 rights.  Baker testified that defendant's statement remained consistent with his previous statement but that defendant said he bought the car from the man for $250.  Baker testified that he told defendant that he did not believe him.  Defendant then told him that after school he was in the vicinity of 54th Street and Lake Park Street when he saw an older white woman get forced into a car by a black male.  He observed a struggle and then the car pulled out of the lot.  Defendant said he ran after the car and followed it to the beach house at 64th
 Street Beach.  He said he saw the black male drag the lady out of the car and beat her with a cane.  The man then took her purse and fled.  Defendant said he then jumped in the car and took off.

Baker testified that he told defendant the story was nonsense.  Defendant then put his head down, sat there for a minute and said "I went off, I killed her, I took the old white lady's car."  Defendant continued saying that he wanted the car so he brought a disguise (a heavy jacket and ski mask) to school, went to the Walgreen's parking lot, approached the car and shoved the old white lady in the car.  Defendant said she was struggling and tapping on the window so he held her down.  He pulled behind the beach house, pulled her out and "just lost it," hitting her with a garbage can several times.  He then drove off.  Defendant told Baker that he had destroyed the disguise, except for the pair of gym shoes he was wearing which were under his bed at home.  Baker participated in the execution of the search warrant of defendant's home which recovered a pair of Nike gym shoes. Despite the confession, defendant was released from Area 2 that evening.  Defendant was not charged with the homicide until one year later.

On cross-examination Baker testified that defendant was originally interviewed as a witness.  However, after he viewed the lineup, defendant was not free to leave until they had straightened out why he was unable to identify Pugh.  Baker admitted that defendant was alone in the interview room with him and another detective, that he knew defendant was only 15 years old and that although youth officers were present that evening in Area 2, none were present during the interview.  Baker additionally testified that defendant did not give a written statement.

At this point of the trial, the State informed the court that the footprint expert it was going to have testify, William Bodziak, had not yet arrived.  As it was early in the day, the defense agreed to proceed with its case and allow the State's expert to testify the next day.  The jury was informed of this.  William Bodziak subsequently testified that he is a self-employed forensic consultant in the area of documents, footwear and tire impression evidence.  Bodziak testified that from 1970 until 1998 he was a special agent for the FBI.  Bodziak spent many of those years at the FBI in the laboratory division developing classes of footwear and tire impressions.  Bodziak has been qualified as a footwear, tire and document examiner since 1976.  He had testified as a footprint expert more than 100 times. 

Bodziak testified that defendant's Nike shoes were sent to him for analysis in 1995.  Bodziak evaluated the photographs of the foot impressions from the scene by creating a series of test impressions including overlays.  Bodziak testified that, in regard to the left shoe:

"I found that the size and the design corresponded.  I found the general condition corresponded; but I wasn't able to find any of the accidental random characteristics that would enable a positive identification.  Based on this examination, I am of the opinion that this shoe could have made this impression; but there was insufficient detail and accidental characteristics of an identifying nature that would have enabled me to go further and say this shoe positively made it."

Bodziak testified similarly with regard to the right shoe as well. 

B.  Defendant's Case 

Before Bodziak arrived, Paul Sahs testified that he was a retired police officer self-employed as a forensic consultant.  Sahs also made test impressions and compared defendant's shoes with the impressions left in the sand at the scene of the crime.  When questioned about the left shoe, Sahs testified that "his opinion was that the known shoe did not make the impression in the sand because of various differences."  Sahs testified similarly with regard to the right shoe as well.

Denise Davis testified that on November 23, 1994, as she approached the intersection at Lake Park Street and 55th Street, she saw an older white female walk towards a greenish Oldsmobile in the Walgreen's parking lot.  Davis saw a black male, medium build, wearing a skull cap and thick glasses, with a mustache and a little fuzzy gray and black beard, approach the woman from behind.  Davis testified that she was approximately 10 feet from this man and had a good opportunity to see his face.   The man pushed the lady in the car into the passenger seat as he got into the car.  The man was hitting the woman and she was screaming.  The car then pulled out of the lot and headed west on 55
th
 Street.  Davis testified that 10 to 15 seconds had elapsed from the time the man got into the car until the car drove off.  Davis ran to a police car parked on 53rd Street and told them what she had witnessed.  

The next day, Davis went to Area 2 and provided detectives with a description of the man she saw.  Davis told the police she would be able to identify the individual who abducted the woman from the parking lot.  On December 1, Davis returned to Area 2 and viewed a lineup.  Davis identified James Pugh as the man she saw involved in the carjacking.  At trial, Davis testified that defendant was not the man she saw abduct the victim from the Walgreen's parking lot.  Davis admitted on cross-examination that she believed she had seen the abductor on two occasions after the incident.

Detective Paul Bernatek testified that he arrested James Pugh on December 1, 1994, on unrelated charges.  Bernatek observed bruising on the palms of both of Pugh's hands when he was arrested.  Photographs of Pugh's hands were taken and introduced into evidence at trial.  Bernatek testified that Pugh was placed in three lineups on December 1.  Bernatek stated that both Denise Davis and Gregory Talbert positively identified Pugh, while Mr. Lopez stated that, of the participants in the lineup, Pugh most resembled the abductor.   Dr. Darryl Graden testified that he was a dentist who examined defendant's teeth several times from 1993 to 1997.  Graden testified that defendant did not have an overbite or a space between his teeth, as did the person described by witness Lopez. 

Dr. Jerry Browning testified that he was a family physician who examined the defendant in 1994 and 1995.  Browning testified that defendant did not require the assistance of glasses.  Browning additionally testified that at the time of trial defendant was heavier and taller than he was in 1994.  

John Eierman, a police officer, testified that when he interviewed Theodius Jackson on April 15, 1997, Jackson told him that he was afraid of being charged with a crime when the Cook County State's Attorney's office interviewed him in connection with the Orlinsky murder.

Douglas Cunningham, defendant's father, testified at trial and at the motion to suppress hearing that when he brought defendant to Area 2 to view the lineup, he told detectives that he did not mind if defendant was questioned concerning the lineup, "but anything other than viewing a lineup, I wanted to be present; and if he needed an attorney, I would want an attorney present."  Douglas testified that an hour elapsed after his son was taken to view the lineup and when he was finally brought into the interview room where defendant was sitting, defendant's eyes were puffy, his face was red and swollen and it looked like he had been crying.  

Eliot Cunningham, defendant's uncle and a former Chicago police officer, testified that he was with Douglas Cunningham at Area 2 while defendant was in the interview room with the detectives.  Eliot testified that defendant's parents were denied access to him during this interview.  

Lonnie Randolph testified that on December 14, 1994, he was a practicing attorney and State Senator.  Randolph received a phone call from another attorney and he proceeded to Area 2 at approximately 10:30 p.m. on the 14th
.   After speaking with Mr. and Mrs. Cunningham, the police made Randolph wait a half hour to 45 minutes before he was allowed to see the defendant.  Randolph testified that when he was finally allowed to see defendant, defendant was obviously distraught, his face was puffy.  Randolph said that defendant looked scared.  Randolph also testified that defendant did not wear any glasses and did not have any facial hair.  

Finally, Robert Louise Cunningham, defendant's mother, testified that in 1994 defendant did not wear glasses, did not have facial hair, did not have an overbite and did not have a space between his teeth. 

The jury deliberated for 10 ½ hours and returned verdicts of guilty of first degree murder, aggravated vehicular highjacking, aggravated kidnaping and robbery.  Defendant was sentenced to concurrent sentences of 80 years for first degree murder, 30 years for aggravated vehicular highjacking, 15 years for aggravated kidnaping and 7 years for robbery.  Defendant now appeals.

II.  ANALYSIS

A.  Defendant's Confession 

Defendant asserts that the trial court should have suppressed his confession because it was not voluntary.  The State bears the burden of proving, by a preponderance of the evidence, that a confession was voluntary.  
People v. Gilliam
, 172 Ill. 2d 484, 501 (1996).  To determine the voluntariness of a confession, including one from a juvenile, the court looks to the totality of the circumstances. 
Gilliam
, 172 Ill. 2d at 500.  Factors to consider include individual aspects of the accused (age, intelligence, background, experience, mental capacity, education, physical condition, and experience with the criminal justice system), and the nature of the interrogation (the legality and duration of the detention, the duration of the questioning, and any physical and mental abuse by police).  
Gilliam
, 172 Ill. 2d at 500-01.  
No one factor is dispositive.  
Gilliam
, 172 Ill. 2d at 500.  "The benchmark of voluntariness is not whether the defendant would have confessed in the absence of interrogation but, rather, whether the defendant's will was overborne at the time of the confession."  
People v. Plummer
, 306 Ill. App. 3d 574, 584 (1999), citing 
People v. Brown
, 169 Ill. 2d 132, 144 (1996).

Additionally, we have recognized that the taking of a juvenile's confession is a "sensitive concern."  
In re G.O.
, 191 Ill. 2d 37, 54 (2000).  
Because of this, the "greatest care" must be taken to assure that the confession was not coerced or suggested and that "it was not the product of ignorance of rights or of adolescent fantasy, fright or despair."  
In re G.O.
, 191 Ill. 2d at 54
.  This court also recognizes a "concerned adult" factor in considering whether the juvenile, either before or during interrogation, had an opportunity to consult with an adult interested in his welfare.  
In re L.L.
, 295 Ill. App. 3d 594, 600-01 (1998).  T
he absence of a parent is one factor to consider but is not, itself, determinative of whether the juvenile's confession should be suppressed.  
People v. Pogue
, 312 Ill. App. 3d 719 (1999).   Similarly, the absence or presence of a youth officer is not alone determinative of voluntariness, but is a material factor to consider.  
In re Lashun H.
, 284 Ill. App. 3d 545, 555 (1996).    The key is whether the absence of an adult interested in defendant's welfare contributed to the coercive circumstances surrounding the interrogation.  
In re D.C.
, 244 Ill. App. 3d 55, 61 (1992).  Police conduct that frustrates a parent's attempt to confer with a juvenile is a significant factor in determining voluntariness of a juvenile's confession.  
In re Lashun H.
, 284 Ill. App. 3d at 552.
  In reviewing a defendant's confession, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence.  However, we will review 
de novo
 the ultimate question of whether the confession was voluntary.  
In re G.O.
, 191 Ill. 2d 37, 50 (2000).

In 
G.O.
, our supreme court noted that G.O., a 13 year old, was arrested in the late hours.  When initially questioned, he denied involvement in the crime.  He was not questioned again until four hours later.  There was no evidence G.O. was abused or failed to receive his 
Miranda
 warnings.  G.O.'s mother was not told he was under arrest for murder or that he would be asked to waive his rights by the officers when they called her.  A youth officer was present during the second 
questioning.  G.O. was never asked to sign a formal waiver of his rights, his statements were never reduced to writing, and the statements were never given to him to review or sign.

On appeal, the appellate court reversed the trial court's denial of the defendant's motion to suppress statements.  
In re G.O.
, 304 Ill. App. 3d 719 (1999).  Our supreme court reversed the appellate court, holding:

"We agree with the State that a juvenile's confession should not be suppressed simply because he was denied the opportunity to confer with a parent or other concerned adult before or during the interrogation.  Nevertheless, we believe that this is a factor that may be relevant in determining whether a juvenile's confession was voluntary.  This is particularly true in situations in which the juvenile has demonstrated trouble understanding the interrogation process, he asks to speak with his parents or another 'concerned adult,' or the police prevent the juvenile's parents from speaking with him."  
In re G.O.
, 191 Ill. 2d at 55.

Under the facts of that case, the supreme court held the confession was voluntary.  G.O. never asked to speak with a parent, the police never frustrated the mother's attempt to confer with him, G.O.'s detention was valid, G.O. was intelligent and did well in school, and G.O. conceded there had been no physical coercion.

Similarly, in another recent supreme court case, 
People v. Morgan
, 197 Ill. 2d 404 (2001), a 14 year old's confession was held to be voluntary although he did not confer with an interested adult prior to or during his interrogation.  In that case the defendant confessed at the crime scene to killing his grandparents.  He repeated the confession at the police station.  The court noted that the defendant was an average student, the defendant was not abused or threatened during the interview, the defendant was given his 
Miranda
 rights, and the defendant wanted to tell what happened when he approached the officer at the scene.  Further, when he was being interviewed, defendant was not handcuffed and the questioning only lasted 30 minutes each time.  The court also noted that although defendant's parents were not contacted, that did not render his confession involuntary.  Defendant told the interviewing officers that his legal guardians were his grandparents, and they were now deceased.  The police did not obtain information regarding defendant's mother until they interviewed the defendant.  Also, defendant never requested to speak with a concerned adult. 

In a motion to cite additional authority, 
defendant cites 
People v. McDaniel
, 326 Ill. App. 3d 771, (2001), where this court found that a 14 year old's confession was involuntary.  In that case, defendant was arrested at 2 a.m. in his mother's home.  Defendant was held in an interview room for five 5 hours and told he could not give a statement until the assistant State's Attorney arrived.  Defendant's mother arrived at the police station at 2:30 a.m. and was denied access to her son until 8 a.m., after defendant confessed.  This court held that the evidence demonstrated that the police frustrated defendant's mother's attempt to confer with him where a police officer's testimony corroborated that defendant's mother made numerous requests to see defendant and was denied.  
McDaniel
, 326 Ill. App. 3d at 784-85.

Even more recently, this court in 
People v. Griffin
, 327 Ill. App. 3d 538 (2002), held that a 15 year old's confession was involuntary where the police frustrated the parents' attempts to see him, he was denied the presence of a "concerned adult," and the circumstances of the detention were coercive.  Defendant was arrested and brought to the police station at 11 p.m, detained for over 18 hours, was questioned for 30 minutes at 3 a.m., and did not make a statement until 5 p.m. the following day.  Defendant's parents stayed at the station all night, which  indicated an interest in their son.  The police refused them access to their son.  While the trial court did not believe that the parents repeatedly asked a woman at the front desk to see their son, it specifically found that the evidence that the police refused to allow defendant's parents to see their son was "unequivocal and uncontroverted."  
Griffin
, 327 Ill. App. 3d at 546.   

In applying these cases to the facts at hand, we find that defendant's confession was voluntary.  First, defendant contends that his statements were involuntary where there was no concerned adult present during the confession.  Specifically, he argues that his father was denied access to him and that no youth officer was present during the interview.  Defendant argues that he testified that when he was brought into the interview room he asked to speak with his father and the detectives refused.  Defendant also argues that his father testified that he told the detectives that he did not want his son questioned without an attorney or himself present.  In its ruling denying defendant's motion to suppress, the trial court extensively reviewed the testimony at the motion to suppress and made extremely detailed findings of fact which take up 38 pages of the record.  While 
G.O.
 had not been decided at the time the trial court ruled on this case, the trial court certainly complied with 
G.O.
's caution that, for the "great deference" "standard of review to function as it is intended, trial courts must exercise their responsibility to make factual findings when ruling on  motions to suppress."  
G.O.
, 191 Ill. 2d at 50.  

The trial court specifically found the defendant's testimony that an attorney or parent's presence was requested prior to the inculpatory statement was "not believable."  The trial court found that the police did not prevent defendant's father from speaking to him.  The court also found there was not any "credible evidence in the record that Demetrius or any of his family members ever asked for or invoked Demetrius' right to counsel prior to making his statement."  As the trial court noted, the record revealed that defendant was brought into the station two days before he made the incriminating statement as a witness.  Defendant's parents were on notice of defendant's information and connection to this crime on December 12
.  Defendant was at home for the next two days during which his parents could seek an attorney's advice or counsel defendant regarding his involvement. 

We acknowledge that defendant's father was present at Area 2 but not asked to be present during the interview.  However, we are mindful of the other facts in this case as well.  On December 12
, the police were told by Borom and Jackson that they had gotten the car from defendant, who told them he had killed an old white lady when he took it.  On that same day, defendant admitted to the police that he had indeed loaned the car to Borom and that he knew that it had been taken in a carjacking during which the owner was murdered.  Defendant voluntarily came to the station with his father on December 14
 to view the lineup.  He came to the station at approximately 6 p.m. and was brought into the interview room by 6:30 p.m.  Defendant was brought into the interview room directly following the lineup in order for the police to determine why he was unable to make an identification. Defendant's interview lasted under 30 minutes, with the actual statement lasting less than 10 minutes.  The trial court found that defendant repeated his confession in the presence of his father.  These facts are directly opposite of the extreme facts present in 
Griffin
 and 
McDaniel
 and, therefore, those cases are easily distinguishable.  The trial court found in the case at bar that the father's absence did not in any way contribute to or create a coercive atmosphere.  It is exactly the function of the trial court to determine the credibility and the weight and inferences to be drawn from the evidence.  
People v. Golden
, 323 Ill. App. 3d 892, 901 (2001).

Defendant asserts that his father had requested to see defendant for over two hours following the interview and that his uncle was denied access to defendant.  Defendant also points out that an attorney was contacted and he was not allowed to see defendant until 30 or 45 minutes after he arrived, at around 11 p.m.  Defendant argues that this evidence establishes that the police frustrated his right to have a "concerned adult" present during the interview.  We disagree.  As the trial court noted, this evidence concerns police conduct 
after
 the incriminating statements were made and "shed little light on the issue of voluntariness."  It is important to note that the trial court precluded the State from eliciting any of the statements defendant made after he saw his father.  

As for the presence of a youth officer, it is uncontested that youth officers were present in the police station but were not present during the interview.  Again, we are mindful that although this absence is a significant factor in the totality of the circumstances analysis, there is no requirement that a youth officer be present when a minor is questioned.  
People v. Griffin
, 327 Ill. App. 3d 538 (2002).  In light of the other factors discussed, especially the evidence that defendant had an opportunity to confer with his father up to 30 minutes before the interview began, the interview lasted only 30 minutes and defendant confessed only 20 minutes after his status changed from witness to potential suspect, we do not feel that the absence of a youth officer created an atmosphere so  coercive as to render defendant's confession involuntary.  

In addition, we note that our supreme court has found the "concerned adult" factor particularly relevant in the following situations: "the juvenile has demonstrated trouble understanding the interrogation process, he asks to speak with his parents or another 'concerned adult;' or the police prevent the juvenile's parents from speaking with him."  
In re G.O.
, 191 Ill. 2d at 55. Here, the evidence established defendant was attending a private high school and there was no evidence of "apparent learning or emotional disabilities."  The trial court found that defendant did not ask to speak with a parent or "concerned adult" and that the police did not prevent defendant's parents from speaking to him.  In making its findings, the trial court said that it he was applying the holding in 
In re J.J.C.
, 294 Ill. App. 3d 227 (1998), a case discussed by 
G.O.
, 191 Ill. 2d at 55.

The evidence also supports the trial court's finding that defendant was advised of his 
Miranda
 rights and understood them.  Defendant was advised of his 
Miranda
 rights immediately prior to his incriminating statement and once again during the interview.  The trial court found that "there is no credible evidence in the record that due to his age, education, physical, mental, emotional or psychological condition that he was not able to understand or knowingly waive his constitutional rights."

The trial court also specifically found defendant's testimony regarding verbal and physical abuse from the police to be not credible.  Again, we defer to the trial court's determination of witness credibility.  
People v. Kolakowski
, 319 Ill. App. 3d 200, 213 (2001).

Weighing against admission is defendant's age and his lack of any significant prior history with the justice system.  However, considering the totality of the circumstances, we find defendant's confession was given voluntarily and free from coercion. We therefore hold that the trial court properly denied defendant's motion to suppress his confession.

B. EXPERT TESTIMONY

1.  
Discovery violation

Defendant next argues that the trial court erred in denying the defendant's motion to bar all or a portion of the testimony of the State's footprint expert, Bodziak.  Bodziak utilized the test impressions and overlays he made of the defendant's Nike shoes in formulating his opinion and in explaining his opinion during his trial testimony.  Defendant contends that the State never informed him of the existence of the impressions and overlays and that they were not given to the defense until an hour before Bodziak testified.  Therefore, defendant maintains that he was prejudiced where he called his footprint expert out of order, before Bodziak, unaware of the overlays.

In a criminal case, the provisions of Supreme Court Rule 412 require the State, upon a defendant's request, to disclose material and information within its possession or control, subject to certain qualifications, including, among other things, the names of the witnesses it intends to call at trial and any reports or statements of experts made in connection with the particular case, including the results of physical or mental examinations and of scientific tests and experiments or comparisons and a statement of the qualifications of the expert. 134 Ill.2d Rs. 412(a), (c).  Rule 412 was substantively amended, effective March 1, 2201, but the amendments are not pertinent to this case.  At the time of trial, Rule 412 further provided: 

"(f) The State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged. 

(g) Upon defense counsel's request and designation of material or information which would be discoverable if in the possession or control of the State, and which is in the possession or control of other governmental personnel, the State shall use diligent good-faith efforts to cause such material to be made available to defense counsel." 134 Ill.2d Rs. 412(f), (g).

The State has a duty to use due diligence to ensure that it becomes aware of discoverable matters and must see that there is a proper flow of information between all the branches and personnel of its law enforcement agencies and legal officers. 
People v. Leon
, 306 Ill. App. 3d 707, 712 (1999).  The purpose of the discovery rule is to afford the accused protection against surprise, unfairness, and inadequate preparation and to afford the defendant an opportunity to investigate the circumstances from which the evidence arose. 
People v. Robinson
, 157 Ill.2d 68, 79 (1993).  Compliance with the discovery provisions is mandatory and will be excused only where the prosecutor was unaware of the existence of the statement or discoverable evidence and could not have become aware of it in the exercise of due diligence. 
Leon
, 306 Ill. App. 3d at 713.

We hold the State did not violate Supreme Court Rule 412 in failing to provide the defense with Bodziak's overlays.  First and foremost, defendant's discovery request did not ask for the impressions and overlays.  The request sought only "any reports or statements of experts...made in connection with this particular cause including the results of physical or mental examinations, any specific tests, experiments or examinations."  Defendant received Bodziak's report which contained his conclusions approximately four years before trial commenced.  The defense had ample opportunity to contact Bodziak during that time frame to discover his methodology and to request any overlays.  In addition, the defense never requested a continuance when they became aware of the overlays in order to review them or discuss them with Bodziak or their own expert.  

Even if we were to assume arguendo that the State violated the discovery rules, defendant's argument would still fail.  In cases where the State has violated discovery provisions, the real issue a reviewing court must address is whether the discovery violation unfairly prejudiced the defendant and whether the trial court failed to eliminate the prejudice.  
People v. Weaver
, 92 Ill.2d 545, 559 (1987).  In this case, the defense suffered no prejudice.  First, the jury was presented with Bodziak's conclusion that it was possible defendant's Nike shoe could have made the print, however, there was insufficient detail to determine with certainty that his shoe made the print.  Defendant was able to cross-examine Bodziak on how he arrived at this conclusion.  During cross-examination, defense counsel asked several questions regarding a book authored by Bodziak on shoeprint evidence.  Defendant also presented direct testimony which rebutted Bodziak's testimony.  Defendant's expert testified that defendant's Nike shoe could not have made the print.  Defendant's expert had also utilized similar overlays and had received Bodziak's report long before trial. In addition, defendant was provided with the overlays before Bodziak's testimony began.  While this did occur after his own expert had already testified, defendant did not seek to recall his witness, nor did he request a continuance at any point.  The trial court did not abuse its discretion by refusing to strike Bodziak's testimony where the defendant suffered no prejudice from the discovery violation.  See 
People v. Pursley
, 284 Ill. App. 3d 597, 605 (1996).

2.  
Statistical theory

Defendant next claims that the trial court erred in allowing Bodziak to testify regarding a statistical theory.  At issue is the following testimony on direct examination:

"Q: (Would you tell us how) the particular shoe size

would be diluted over the purchase in relation to the

purchase of other shoes.

A: The size or design?

Q: The size, design, and general condition.

A: All right.  There is, according to the Footwear Industry of 

America, there is approximately one and-a-half billion shoes 

that are sold; whether they are imported sold or made in 

America sold, but they are sold in the United States every 

year. One and-a-half billion is an extremely large number.

In any particular design there may be a couple of hundred 

thousands, for instance, of this shoe made each year; but in 

a particular size, such as this is a size 12, there may be 

only ten percent of that, so twenty thousand shoes.  When you 

divide the one and-a-half bill [
sic
] into twenty thousand, you 

are talking about a very infrequent occurrence.

Q: One out of twenty thousand comes out to about- well, 

the math, one out of every three hundred thousand?

A: I believe so.

Q: Does that sound about right?

A: Just as an- for example, yes."

The defense did not object to this testimony on direct examination.  On cross-examination, defense counsel asked:

"Q: All right. Now when all is said and done with

everything that you have testified here today, you cannot say 

that the shoes, 54-A and B created the unknown footprint in 

the sand, could you?

A: That was my testimony; that is right.

Q: You can't do it.  It could have been made by another 

shoe?

A: It could have been made, yes.

Q: And while Mr. Sahs in his opinion said it was- they

did not make the impression, all you are saying is that it 

could have; but it could have been made by another shoe?

A: It could have been made by another shoe in the same general 

condition with the same mold characteristics and the same size 

and design.

Q: And with regard to the number of shoes that were made, 

you estimated was a one and-a-half billion shoes that come 

into the country?

A: The latest information from the Footwear Industry of

     America is that each year approximately 100-excuse me- one 

and-a-half billion shoes are sold in this country.

Q: All right. And then your indication was that in a

particular shoe size it was 20 percent of-

A: Well, well for size 12, it is about 9.6, 9.7 percent;

so approximately 10 percent.  And that hypothetical I gave, 

if there were 200,000 pairs sold, then that would be 20,000.

Q: But that is exactly what it is is a hypothetical, right?

A: That is what-

Q: As you sit-

A: -I was asked, yes.

Q: As you sit there you have no idea how many of those

shoes were made, do you?

A: I don't think it is 200,000; it is probably less, but 

I don't know the number now.

Q: You just don't know?

A: That is right."

On redirect, the State again elicited from Bodziak that of the approximated 1.5 billion shoes sold in the United States in a given year, he estimated that 20 thousand would be of the same size and design as defendant's shoes.  When the State asked "So that is one out of every 300,000?" the defense said, "Objection Judge," offering no basis for the objection.  The court overruled the objection, and Bodziak answered "yes."  On re-cross, defense counsel again confirmed that Bodziak did not know how many of that particular shoe were made or how many of those shoes were in the Chicagoland area at the time of the murder.  

Defendant maintains that the State failed to lay the proper foundation for such statistical conclusions and, therefore, the trial court committed reversible error allowing the testimony in.  At trial, defense counsel did not object at all to Bodziak's statistical testimony given on direct.  On cross, defense counsel had Bodziak repeat the number of shoes sold in the United States annually and the approximate number of shoes with the same size and design as defendant's.  The first time the defense objected to Bodziak's testimony regarding the comparison of those two numbers was on re-direct.  This objection was made without stating its basis.  Our supreme court has held that it is well settled "that the failure to object on proper grounds at trial results in waiver of the issue through 'procedural default.'" 
People v. Lewis
, 165 Ill. 2d 305, 336 (1995).  Further, defense counsel had Bodziak repeat on cross-examination the testimony about which he complains now.  A criminal defendant cannot complain on appeal about the introduction of evidence which he procures or invites.  
People v. Williams
, 192 Ill. 2d 548, 571 (2000).  Finally, defendant did not object to Bodziak's statistical testimony on direct.  An issue which has not been objected to during trial and raised in a post-trial motion is not preserved for appeal.  
People v. Fender
, 325 Ill. App. 3d 168, 175 (2001).

In the instant case, Bodziak testified that the numbers he was providing were approximations based on information obtained from the Footwear Industry of America as well as from Nike.  Bodziak did not testify to, or claim to have, exact and certain numbers of shoes produced in this country.  Defense counsel had the opportunity, and took it, to expose this fact during cross-examination.  The defense presented their own shoeprint expert who testified that Nike used several molds to produce the type of shoe worn by defendant and which left the shoe print found at the scene.  Bodziak testified, as defendant himself points out, that he did not know exact numbers of shoe production, and that the figures he was testifying to were not specific to the type of Nike Air Bound shoes found in defendant's house.  Bodziak testified that any figure resulting from dividing the number of shoes sold in the United States in a year by the number of shoes made of a particular design should be treated as an "example", not as a conclusive, reliable number.  Bodziak admitted his numbers were estimates.  Defense counsel had the opportunity to minimize the effect of Bodziak's testimony during cross-examination.  Also, the jury was repeatedly informed that Bodziak's conclusion determined only that defendant's shoe "could have" made the print. Based on the record, we find that the issue of Bodziak's testimony regarding "statistical analysis" has been knowingly waived.  

In 
People v. Campbell
, 146 Ill. 2d 363 (1992), our supreme court held that under appropriate circumstances, shoeprint evidence may be as reliable and trustworthy as any other evidence.  In 
People v. Aquinaga
, 231 Ill. App. 3d 153 (1992), the State presented testimony from a forensic examiner from the Chicago Police Crime lab.  That investigator testified that there were 10 individual characteristics and unique markings found on the defendant's shoes and on shoeprints found at the scene of the crime, including separated lines, broken ridges, notches and cuts.  In the investigator's opinion, only the defendant's shoe could have made the impression on an envelope found near the victim's apartment. "This shoeprint evidence, standing alone, was sufficient to support a conviction for murder."  
People v. Aquinaga
, 231 Ill. App. 3d at 174; citing 
People v. Campbell
, 146 Ill. 2d 363 (1992).  The defendant in 
Aguinaga
 had called a manufacturer's agent for the exclusive seller of Pony athletic wear in northern Illinois.  The agent testified that approximately 2,000 pairs of shoes with the same design and size as defendant's had been sold in the Chicagoland area. For analysis of case law discussing the admissibility of footprints as evidence, the issue is thoroughly discussed in 
Footprints as Evidence
, 35 A.L.R. 2d 856, and its many updates.

Defendant cites 
People v. Harbold
, 124 Ill. App. 3d 363 (1984), for the proposition that is improper to introduce statistical probabilities for the purpose of establishing a historical fact.  
Harbold
 addressed a situation in which the State's experts testified that they analyzed blood samples prepared from physical evidence in the case and typed those samples according to ten systems of genetic characteristics or "markers."  One of the experts testified that given the ten groups of characteristics tested and the percentage of population known to display each characteristic..." the probability of an accidental match is less than one in 500."  
Harbold
, 124 Ill. App. 3d at 367.  The appellate court reversed defendant's conviction holding that, while experts may "testify to the percentage of the population exhibiting certain combinations of blood characteristics," it was improper to express "the similarity between the perpetrator and defendant in terms of the likelihood of a random match."  
Harbold
, 124 Ill. App. 3d at 383. 

We note that in 
People v. The Almighty Four Hundred
, 287 Ill. App. 3d 123 (1997), this court affirmed the admission of a statistical probability estimate testified to by a DNA expert.  Citing 
People v. Miller
, 173 Ill. 2d 167, 188-89 (1996), this court held that the trial court did not abuse its discretion in allowing the DNA expert to testify that the likelihood that the blood on the defendant's pants came from someone other than the victim was less than one in a billion.  
People v. The Almighty Four Hundred
, 287 Ill. App. 3d at 129-30.

We note that Bodziak's testimony that approximately 1.5 billion shoes are sold in the United States and 20 thousand of those are of the same design and size as the defendant's shoes was not used in terms of the likelihood of a random match, as condemned in 
Harbold
.  The resulting estimated number arguably described a percentage of the "shoe population" exhibiting certain characteristics.  However, comparing the characteristics of shoes with the combinations of blood characteristics in the population requires quite a leap.  Our research has not found a reported case discussing the admissibility of statistical probabilities in a case involving shoeprint evidence.  While this issue was deliberately waived in the instant case, courts should be concerned that such testimony may have an impact on a jury out of all proportion to its true value.

For the foregoing reasons, in this opinion and for the reasons set out in our Rule 23 order issued contemporaneously with this opinion, we affirm defendant's convictions and sentence.

Affirmed.

CAMPBELL, P.J. and REID, J., concur.