No. 2--05--0028      Filed: 4-30-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | No. 02--CF--2047 |
| v. | ) ) | |
| JOSHUA R. MINNITI, | ) ) ) | Honorable Patricia Piper Golden, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE GILLERAN JOHNSON delivered the opinion of the court:

After a bench trial before the circuit court of Kane County, the defendant, Joshua R. Minniti, was found guilty of first-degree murder (720 ILCS 5/9--1(a)(1) (West 2000)), home invasion (720 ILCS 5/12--11(a)(2) (West 2000)), and two counts of aggravated criminal sexual assault (720 ILCS 5/12--14(a)(2) (West 2000)). The defendant was sentenced to 61 years' imprisonment for first-degree murder and 6 years' imprisonment for each of the remaining counts, all sentences to be served consecutively. The defendant appeals, contending that the trial court erred in denying his motion to suppress statements and that he is entitled to additional sentencing credit for time served prior to sentencing. We disagree with his first contention, agree with his second, and affirm the judgment as modified.

I. BACKGROUND

On October 21, 2001, 57-year-old Irma Braun was found bludgeoned to death in her home. Almost a year later, the defendant, who was 15 years old at the time the crime was committed, was arrested for Braun's death. On October 8, 2002, the defendant was charged by indictment with four counts of first-degree murder, one count of home invasion, and two counts of aggravated criminal sexual assault. On May 2, 2003, the State filed a notice of intent to seek an extended-term sentence based on the statutory factor of "exceptionally brutal or heinous behavior indicative of wanton cruelty."

On July 22, 2003, the defense filed an amended motion to suppress statements. The motion alleged that although the investigators notified the defendant's father that they were going to interview the defendant concerning the subject crime, they did not tell his father that they had physical evidence implicating the defendant and that the defendant was going to be arrested and charged. The motion also alleged that the juvenile officer present for the interview did nothing to protect the defendant's rights and that the investigating officers used deceit and trickery to induce the defendant's confession. On July 31, 2003, a hearing was held on the motion to suppress.

At the hearing, Officer Keith Gardner, a detective with the Kane County sheriff's office, testified that on October 21, 2001, during a canvass of the victim's neighborhood, he interviewed the defendant's father, Joseph Minniti (Minniti). The defendant and his family lived two houses west of the victim's house. Officer Gardner received permission from Minniti to speak with the defendant. On May 21, 2002, Officer Gardner again received permission to speak with the defendant and collected a DNA swab from him.

On September 3, 2002, Officer Gardner testified that he reinterviewed Minniti about the murder, at the sheriff's office. Officer Gardner again asked Minniti for permission to speak with the

defendant. Minniti gave permission and requested that Officer Gardner call his cell phone to set up a time for the interview. No particular date was mentioned at that time.

On September 5, 2002, Officer Gardner called Minniti's cell phone, but there was no answer. Officer Gardner then called the defendant's house, but again there was no answer. Officer Gardner then left a message on Minniti's cell phone, informing him that he was en route to West Aurora High School to pick up the defendant for an interview. Officer Gardner told Minniti to call him when he received the message.

Officer Gardner further testified that he and Sergeant Stutz arrived at the high school at 2:30 p.m. Sergeant Stutz arranged with the school officials to have the defendant removed from class to speak with the officers. The defendant remembered Officer Gardner from earlier interviews but indicated that his father had not told him that the police wanted to speak with him again. The defendant agreed to go to the sheriff's office for another interview. The defendant informed the officers that he needed to be at work at 5 p.m.

At the sheriff's office, the defendant was placed in an interview room. Officer Gardner, Sergeant Stutz, and Sergeant David Wagner were present for the interview. The officers asked the defendant whether he wanted anything to eat or drink or had to use the washroom. The defendant declined. Officer Gardner testified that at some point, he again called Minniti's cell phone. Minniti answered, and Officer Gardner told him that the officers had picked the defendant up from school and brought him to the sheriff's office. Minniti again gave Officer Gardner permission to speak with the defendant.

Officer Gardner testified that the interview began at 3 p.m. Sergeant Stutz read the juvenile-subject data sheet, and the Miranda rights, to the defendant. Sergeant Stutz explained each right to

the defendant, and the defendant signed a waiver of his rights. Sergeant Stutz informed the defendant that he was there as a juvenile officer to help the defendant and that the defendant should ask Sergeant Stutz if he had any questions during the interview.

Officer Gardner testified that he and Sergeant Wagner questioned the defendant. They told the defendant that they were reinterviewing neighbors because it had been almost a year since the crime. Sergeant Wagner asked the defendant if he was involved in the victim's death. The defendant denied any involvement. The defendant explained that on the morning of the crime he went to the Aurora Country Club, where he worked as a caddy. Around 12 p.m., he went to his neighbor's house across the street to play basketball. The defendant went back to his house about 8 p.m. He brought his dogs outside into the yard and sat on the sunporch. After that, he went to bed. The defendant indicated that he occasionally did odd jobs for the victim, and he explained some of those jobs. At about 4 p.m., the officers took a 20-minute break.

Officer Gardner testified that during the break he learned that Minniti was trying to reach him, so he called him. Minniti asked what was taking so long and said that the defendant had to be at work by 5 p.m. Officer Gardner told Minniti that the defendant was cooperating and that he did not know how much longer the interview would last. Minniti did not ask to speak with the defendant.

The interview resumed at 4:20 p.m. During this round of questioning, the officers asked the defendant about inconsistencies in his stories from his earlier interviews. The officers told the defendant that DNA evidence implicating him was found inside the victim and that there was satellite imagery showing a person leave the defendant's home, enter the victim's house, and then return to the defendant's home. According to Officer Gardner, the defendant then became defensive,

started yelling and swearing, and asked to go home. Sergeant Stutz told the defendant that "it was probable" he was not going home that night. The defendant agreed to continue being questioned and eventually admitted that "it was an accident."

According to Officer Gardner's testimony, the defendant stated that he left his basement at 1 a.m. and walked to the victim's house. He first checked to see if her car was there, and it was not. He then went inside the home to steal a portable stereo that he had seen earlier in her bedroom. He used a crowbar to force his way in through the back door. He went upstairs to the bedroom. The bedroom was dark, and he did not see that the victim was in the room. The defendant walked toward the portable stereo, and the victim came up behind him and grabbed his neck. The defendant then reached back with the crowbar and struck the victim in the head. The victim fell to the floor and was bleeding. The defendant went to the kitchen and thought about calling an ambulance but did not. The defendant then went back to the bedroom to check on the victim. He knelt down next to her and she grabbed him, so he struck her on the head several times. This second round of questioning, which lasted about one hour, ended at about 5:20 p.m.

Officer Gardner testified that the interview resumed at 5:30 p.m. and lasted about 10 minutes. The defendant was no longer angry, but was very emotional and apologetic. When the defendant was confronted with evidence that a sexual assault had occurred, he admitted that it was possible that he had "stuck it in her twice." The officers took another break for five minutes. At 5:45 p.m., the defendant was asked whether he penetrated the victim anally. The defendant said he might have but thought he penetrated only the victim's vagina.

After another five-minute break, Assistant State's Attorney Bob Berlin questioned the defendant for over an hour. At 6:32 p.m., the defendant consented to being videotaped. In the

videotaped statements, the defendant essentially repeated what he had told Officer Gardner in the 4:20 p.m. interview. The defendant also indicated that after he returned to the victim's bedroom and struck her again, he penetrated the victim in the vaginal area twice. After that he was in shock and stumbled around the house, used the hallway bathroom, and then left through the same back door. He threw away the clothes he was wearing and dumped the crowbar in someone's trash.

On cross-examination, Officer Gardner admitted that he lied to the defendant about some of the DNA evidence and the satellite photos. While the police did match the defendant to the DNA from a drop of urine found in the victim's bathroom, his DNA was not found inside the victim. Officer Gardner also admitted that there was no satellite imagery. Officer Gardner testified that when he spoke with Minniti, he did not tell him about the DNA evidence. When Officer Gardner returned Minniti's phone call following the first round of questioning, he still did not tell him about the DNA evidence. Rather, Officer Gardner assured Minniti that the questioning was along the same lines as previous interviews.

Sergeant Stutz, of the juvenile division of the Kane County sheriff's office, testified that on September 5, 2002, he and Officer Gardner went to West Aurora High School to pick up the defendant. Sergeant Stutz explained to the defendant that he was there as a juvenile officer and that the police had his father's consent to speak with him. The defendant did not realize that he was going to be interviewed again, but he knew that his father had been recently questioned. The defendant agreed to go to the station and was not handcuffed.

At the station, the defendant was placed in an investigation room. Sergeant Stutz filled out a subject data sheet with the defendant. While filling out the sheet, the defendant stated that he had not taken any alcohol, drugs, or medications in the last 24 hours. The defendant stated that he had

slept for nine hours the night before and had last eaten at 11:30 a.m. The defendant did not appear confused. On the data sheet, the defendant circled that he had completed the tenth grade. The defendant denied any physical discomfort, that he was under a doctor's care, that he had talked to a psychiatrist in the last 12 months, and that he had attempted suicide in the last two years. He described his emotional and physical well-being as good. Sergeant Stutz told the defendant that he was a juvenile officer there on the defendant's behalf and would not partake in the interview. Sergeant Stutz explained that if the defendant did not understand something during the interview, he should tell him. The defendant signed the data sheet.

Sergeant Stutz testified that he then read the defendant his Miranda rights from a preprinted form. He also explained each right. The defendant indicated that he understood his rights and initialed each sentence. After the defendant waived his rights, Sergeant Stutz remained with the defendant throughout the interview. Sergeant Stutz testified that during the interview, when the defendant was confronted with certain evidence, he raised his voice and started to cry. The officers remained calm and did not threaten or promise anything to the defendant. The defendant did not appear to have difficulty communicating his answers to the officers. The defendant was offered food, drink, and the opportunity to use the bathroom. On cross-examination, Sergeant Stutz acknowledged that he knew that some of the information the officers told the defendant was incorrect, but he chose not to interrupt the interview.

Minniti testified that he learned of the victim's murder on October 21, 2001, when the police came to speak with him and his son. Later, the police asked him and the defendant for fingerprints and DNA samples. On September 5, 2002, at around 2 p.m., Officer Gardner left a message on his cell phone, informing him that the police went to the high school to pick up his son for "routine

questioning." When Minniti returned the call, Officer Gardner said he was on the way to the sheriff's office with the defendant. Officer Gardner told him they were doing a follow-up interview since it had been almost a year since the crime. Officer Gardner did not tell him that the police had any new evidence. Minniti gave the officers permission to interview his son. Two days earlier, Minniti had been interviewed by the police. They did not discuss any new evidence or information about the case. Minniti's interview lasted about 5 to 10 minutes, and at that time, he gave the police permission to speak with his son. Minniti gave Officer Gardner his cell phone number so that at a later date they could work out the "specifics" of his son's interview.

Minniti further testified that he found it peculiar that it was almost 5 p.m. and his son was still with the police. He called Officer Gardner around 4:30 or 4:45 p.m. Officer Gardner's secretary told him that Officer Gardner was still in the interview room and that he would return the call. Officer Gardner called Minniti back about an hour later. Officer Gardner told him that the officers were ready to wrap up the interview. Officer Gardner did not tell him that they were going to arrest his son. Minniti did not remember whether he asked to speak with his son. Minniti did not go to the station. At 7:30 p.m., Officer Gardner called Minniti again and told him that he was on the way to his house. Minniti asked whether the defendant was coming home, and Officer Gardner said that he was not, but did not give any explanation. Soon after, Officer Gardner arrived at Minniti's house to execute a search warrant.

The defendant testified that he was 16 years old on September 5, 2002, when he was arrested and charged with murder. When he was picked up from school, he went with the officers willingly. He stated that Sergeant Stutz did not tell him that he was a juvenile officer. Rather, Sergeant Stutz said he was there so the police "don't beat up on him." Sergeant Stutz helped him fill out a form and

asked him if he wanted something to drink. The defendant further testified that after one of the breaks, the officers came back into the interview room with a folder and told him, "we think that you are involved with it," referring to the murder. The defendant testified that he then told the officers that he wanted to see his father and a lawyer. He also asked to go home. Officer Gardner told him that he would "get on it" but continued questioning him. The defendant testified that he was not allowed to see his father or speak to a lawyer during the interview. He was not told that his father had called during the interview.

The defendant further testified that although Sergeant Stutz went over the intake form and read him the Miranda rights, he did not fully understand his rights. The defendant testified that he did not understand that he could stop the questioning at any time. He insisted that he asked to see his father and a lawyer. He testified that he eventually signed a statement agreeing to give videotaped statements, at which time attorney Berlin asked him more questions and went over the Miranda rights again. The defendant acknowledged that he did not tell attorney Berlin that he had asked for a lawyer or that he wanted his father there. However, he told attorney Berlin that he had asked to go home. The defense rested its case.

Sergeant Wagner of the Kane County sheriff's office testified that he was present for the defendant's interview with Officer Gardner and Sergeant Stutz. Sergeant Wagner did not recall the defendant asking to see his father or a lawyer during the interview. According to Sergeant Wagner, Sergeant Stutz did not introduce himself to the defendant by saying, "I am here so that they don't beat you up." Rather, Sergeant Stutz said that he was there on the defendant's behalf as a juvenile officer and explained that his role was to make sure that the defendant's rights were protected.

Sergeant Stutz and Officer Gardner were called to rebut the defendant's testimony. They both testified that Sergeant Stutz informed the defendant that he was a juvenile officer. They denied that the defendant was told that Sergeant Stutz was there so that other officers did not "beat up" on him. They stated that the defendant did not ask to see his father or a lawyer.

Officer Gardner further testified that during the defendant's interview, he received a message from a lawyer indicating that he had been contacted by the Minniti family and was calling on the defendant's behalf. The lawyer left his name and phone number. The message was received at 7:30 p.m. on the day of the interview. Officer Gardner listened to the message sometime after executing the search warrant or the next day. He did not save the message or prepare a report about it. He did not return the call because he did not feel it was relevant. Officer Gardner had not informed anyone about the phone call until the suppression hearing.

Attorney Berlin testified that he met the defendant at about 5:50 p.m. on September 5 and had not been present for any of the earlier interviews that day. Attorney Berlin asked the defendant if the police read him his rights and if he understood those rights. The defendant responded in the affirmative. The defendant told attorney Berlin that he had already given statements to the police. Attorney Berlin testified that the defendant had no problem communicating and that he gave appropriate responses to questions. Attorney Berlin verbally advised the defendant of his rights, and the defendant indicated that he understood each of them. The defendant also indicated that he would give another statement. The defendant did not ask to see his father or a lawyer.

Attorney Berlin further testified that when the defendant agreed to give videotaped statements, attorney Berlin advised him of his rights a second time. Attorney Berlin asked the defendant how he was treated by the police, and the defendant said he was treated fine. The

defendant did not indicate that his rights were violated or that he had asked to see his father or a lawyer. The defendant said that no threats or promises were made.

After hearing arguments, the trial court gave detailed findings regarding the voluntariness of the defendant's statements. The trial court discussed the factors relevant to such a determination and its findings on those factors. Specifically, the trial court found that the defendant was 16 years old at the time of his statements and had little previous experience with the criminal justice system; the defendant was of average intelligence; the time of day and the duration of the questioning were proper; the interview was with the defendant's father's consent; the defendant was informed of his rights numerous times; the defendant was not subjected to any physical punishment; the confession was not induced by the police deception; the police deception did not render the defendant's confession involuntary; the juvenile officer's presence was the reason that numerous breaks were taken; the defendant's father was aware of the interrogation and had the opportunity to go to the police station; and the defendant's assertion that he had asked to speak with his father and a lawyer was incredible. As such, the trial court found that the defendant's statements were made knowingly and voluntarily and were not coerced, nor was the defendant's will overborne. The trial court denied the defendant's amended motion to suppress.

Thereafter, the defendant waived his right to a jury trial, and a bench trial commenced on February 2, 2004. On February 6, 2004, the trial court found the defendant guilty on one count of first-degree murder (720 ILCS 5/9--1(a)(1) (West 2000)), one count of home invasion (720 ILCS 5/12--11(a)(2) (West 2000)), and two counts of aggravated criminal sexual assault (720 ILCS 5/12--14(a)(2) (West 2000)). As to the counts of murder and aggravated criminal sexual assault, the trial court found that the crimes were exceptionally brutal and heinous. On November 30, 2004,

following a sentencing hearing, the trial court sentenced the defendant to 61 years' imprisonment for murder and 6 years' imprisonment on each of the remaining counts, to be served consecutively. Also on that date, the trial court admonished the defendant of his appeal rights in accordance with Supreme Court Rule 605(a) (210 Ill. 2d R. 605(a)).

On January 7, 2005, the parties appeared before the court and the following exchange ensued:

"[DEFENSE COUNSEL]: And I am asking leave at this time to file a motion to reconsider. It should have been filed about a week ago. It was inadvertently placed in a wrong pile of documents to be filed.

I believe that if the [S]tate does not object, the court does not lose jurisdiction over the matter to hear the motion to reconsider, and it is fairly brief in nature, Judge.

THE COURT: Do you object?

[ASSISTANT STATE'S ATTORNEY]: No, your Honor, we don't.

THE COURT: You are given leave to file it instanter."

Thereafter, argument was heard on the defendant's motion to reconsider his sentence. The State stood on the arguments that it made at the sentencing hearing and further argued that the trial court had not erred in sentencing because the trial court had found the crime to be brutal and heinous. The trial court denied the defendant's motion to reconsider. The defendant filed his notice of appeal the same day.

## II. DISCUSSION

At the outset, we note that the parties dispute this court's appellate jurisdiction. The defendant acknowledges that he did not timely file his motion to reconsider sentence. The defendant's motion to reconsider sentence was filed and denied on January 7, 2005, 38 days after he

was sentenced. The defendant filed his notice of appeal that same date. The State argues that under the doctrine of revestment, its mere failure to object to the defendant's late filing of his motion to reconsider did not revest the trial court with jurisdiction over the motion. The defendant argues that the revestment doctrine applies because, in addition to failing to object to the late filing of his motion to reconsider, the State also actively participated in the hearing on the defendant's motion by arguing that the trial court had properly determined that the crime was brutal and heinous. The defendant argues that the State's active participation in a proceeding that was inconsistent with the merits of the prior sentencing order revested the trial court with jurisdiction such that we have jurisdiction to consider his subsequent appeal.

A trial court loses jurisdiction to vacate or modify its judgment 30 days after entry of judgment unless a timely postjudgment motion is filed. People v. Flowers, 208 Ill. 2d 291, 303 (2003) (where more than 30 days have elapsed since the imposition of a sentence, and the trial court has not extended the 30-day period, the trial court is divested of jurisdiction to hear a postjudgment motion); Beck v. Stepp, 144 Ill. 2d 232, 238 (1991); People v. Sawczenko, 328 Ill. App. 3d 888, 893 (2002). However, under the revestment doctrine, litigants may revest a court that has general jurisdiction over the matter with both personal and subject matter jurisdiction over the particular cause after the 30-day period following final judgment. People v. Kaeding, 98 Ill. 2d 237, 240 (1983). Revestment applies when the parties (1) actively participate without objection (2) in further proceedings that are inconsistent with the merits of the prior judgment. Kaeding, 98 Ill. 2d at 241; Ridgely v. Central Pipe Line Co., 409 Ill. 46, 50 (1951).

This court recently explained the rationale behind the doctrine:

-13-

"It has been stated that the rationale behind the revestment doctrine is that the trial court considers the benefitting party to have ignored the judgment and started to retry the case (Wilkins v. Dellenback, 149 Ill. App. 3d 549, 555 (1986)), the benefitting party by its conduct consents to have the prior ruling set aside (Sears v. Sears, 85 Ill. 2d 253, 260 (1981)), or that the benefitting party by its conduct waives the right to question the jurisdiction of the court (Ridgely v. Central Pipe Line Co., 409 Ill. 46, 50 (1951))." People v. Price, 364 Ill. App. 3d 543, 546 (2006).

This court also recently questioned the continued vitality of the doctrine. See Price, 364 Ill. App. 3d at 546. The Price court noted our supreme court's holding in Flowers, which indicated, " '[l]ack of subject matter jurisdiction is not subject to waiver [citation] and cannot be cured through consent of the parties [citation].' " Price, 364 Ill. App. 3d at 547, quoting Flowers, 208 Ill. 2d at 303. The Price court questioned whether the revestment doctrine survived Flowers. Price, 364 Ill. App. 3d at 546. The Price court suggested that tracing the roots of the revestment doctrine showed that at one point it allowed a party's acquiescence to revest a court only with personal, and not subject matter, jurisdiction. Price, 364 Ill. App. 3d at 547, citing Grand Pacific Hotel Co. v. Pinkerton, 217 Ill. 61 (1905). However, the Price court also questioned whether our supreme court would implicitly overturn the revestment doctrine. Price, 364 Ill. App. 3d at 546. Ultimately, the Price court determined that it must "leave open the question of whether *** the revestment doctrine survive[d] the supreme court's decision in Flowers," because revestment had not occurred under the facts of that case. Price, 364 Ill. App. 3d at 547.

Since Price, however, this court has held that the revestment doctrine remains intact. See People v. Montiel, 365 Ill. App. 3d 601, 604-05 (2006). In Montiel, this court determined that in

Toman v. Park Castles Apartment Building Corp., 375 Ill. 293, 302 (1940), our supreme court used language that was indistinguishable from that used in Flowers. Montiel, 365 Ill. App. 3d at 605. Specifically, in Toman, our supreme court stated that " '[i]t is a familiar rule that when a court has no jurisdiction of the subject matter, it cannot be conferred by consent ***. *** There can be no waiver of jurisdiction of the subject matter where the trial court lacked jurisdiction to enter the order appealed from.' " Montiel, 365 Ill. App. 3d at 605, quoting Toman, 375 Ill. at 302. Despite that language, our supreme court applied the doctrine of revestment at least as recently as Kaeding, 98 Ill. 2d at 241. Montiel, 365 Ill. App. 3d at 605. As such, the Montiel court determined that if Toman did not eliminate the doctrine of revestment, then neither did Flowers, which expressed the same principles as Toman. Montiel, 365 Ill. App. 3d at 605.

The Montiel court further explained that the doctrine of revestment can be reconciled with Flowers and Toman because "it is not consent but active participation that revests jurisdiction." (Emphasis in original.) Montiel, 365 Ill. App. 3d at 605. Furthermore, the roots of the revestment doctrine are not in conflict with this determination. The Price court suggested, citing Pinkerton, 217 Ill. at 84, that the revestment doctrine at one point allowed a party's acquiescence to revest a court only with personal, and not subject matter, jurisdiction. However, in the context of the Pinkerton case, the holding has repeatedly been interpreted to mean that where a court of general jurisdiction over the subject matter loses jurisdiction of a particular case by operation or effect of law, the parties may, by voluntarily appearing and participating in further proceedings, revest the court with jurisdiction over their persons and the subject matter of the action. Kaeding, 98 Ill. 2d at 240-41; Craven v. Craven, 407 Ill. 252, 255 (1950); Rossiter v. Soper, 384 Ill. 47, 59-60 (1943). As such, pursuant to Montiel, the revestment doctrine remains intact. Montiel, 365 Ill. App. 3d at 605.

Cases relying on the revestment doctrine reveal that there is a presumption that the application of the revestment doctrine to an untimely postjudgment motion essentially tolls the time for filing an appeal. In other words, if a trial court is revested with jurisdiction of an untimely postjudgment motion, then a defendant's notice of appeal, filed within 30 days after the ruling on the motion, vests the appellate court with jurisdiction. For example, in People v. Harrell, 342 Ill. App. 3d 904, 907 (2003), the defendant filed an untimely postjudgment motion. This court stated that "[a]lthough the posttrial motion was admittedly filed late, the State concede[d] that appellate jurisdiction [was] proper because the State participated in the hearing without objection." Harrell, 342 Ill. App. 3d at 907; see also People v. Watkins, 325 Ill. App. 3d 13, 17 (2001) ("[b]ecause defendant filed his notices of appeal within 30 days from the date of the denial of the [untimely but revested] motions, his appeals are timely"); People v. MacArthur, 313 Ill. App. 3d 864, 868 (2000) ("[a]s defendant filed his notice of appeal only four days after the [denial of] his [untimely but revested] motion, his appeal is timely"). Although Supreme Court Rule 606(b) (188 Ill. 2d R. 606(b)) generally sets forth the methods to invoke this court's appellate jurisdiction, in MacArthur this court characterized revestment as "an exception to the timeliness requirement[s] of Rule 606(b)." MacArthur, 313 Ill. App. 3d at 868.

As such, based on the traditional application of the revestment doctrine, we have appellate jurisdiction over this case. The State actively participated in the hearing on the defendant's untimely postjudgment motion. The State appeared at the hearing. The trial court asked the State if it objected to the filing of the motion on the basis that the motion was filed a week late. The State indicated that it had no objection. The trial court then granted the defendant leave to file his late motion to reconsider, and the hearing ensued. The State then went on to argue that the defendant's

motion should be denied because the trial court had properly determined that the crime was brutal and heinous. Furthermore, the hearing on the motion to reconsider was inconsistent with the merits of the prior judgment. See People v. Gargani, No. 2--05--0478, slip op. at 2 (February 14, 2007) (the prosecutor's active participation in the hearing on the motion to reconsider sentence was inconsistent with the merits of the prior judgment because it was a tacit acknowledgment that the prior proceedings should be revisited). As such, the State's active participation in a proceeding that was inconsistent with the merits of the prior sentencing order revested the trial court with jurisdiction of the defendant's postjudgment motion. See Kaeding, 98 Ill. 2d at 241. The defendant's notice of appeal, filed within 30 days after the ruling on his untimely but revested postjudgment motion, vests the appellate court with jurisdiction. See Montiel, 365 Ill. App. 3d at 605; Harrell, 342 Ill. App. 3d at 907; Watkins, 325 Ill. App. 3d at 17; MacArthur, 313 Ill. App. 3d at 868. Accordingly, we will address the merits of the defendant's appeal.

On appeal, the defendant first contends that the trial court erred in denying his motion to suppress statements. In support of this contention, the defendant argues that his statements to the police were involuntary because they were the product of police deception, the police frustrated his father's ability to confer with him before and during his interrogation, and the juvenile officer present during the interrogation did not protect his rights. Admitting an involuntary confession into evidence violates the fifth amendment to the United States Constitution (U.S. Const., amend. V) and article I, section 10, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §10). People v. Nicholas, 218 Ill. 2d 104, 118 (2005).

A confession is voluntary if it is the product of free will, rather than the product of the inherently coercive atmosphere of the police station. People v. Willis, 215 Ill. 2d 517, 535 (2005).

To determine whether the defendant's confession was voluntary, we consider the totality of the circumstances surrounding it, including the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interrogation; the duration of the interrogation; the presence of Miranda warnings; the presence of any physical or mental abuse; and the legality and duration of the detention. Nicholas, 218 Ill. 2d at 118. No one factor is dispositive. People v. Gilliam, 172 Ill. 2d 484, 500 (1996).

Additionally, we recognize that the taking of a juvenile's confession is a sensitive concern. In re G.O., 191 Ill. 2d 37, 54 (2000). Accordingly, "the 'greatest care' must be taken to assure that the confession was not coerced or suggested and that ' "it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." ' [Citations.]" G.O., 191 Ill. 2d at 54. As such, where a juvenile is concerned, additional factors to consider include whether the juvenile, either before or during the interrogation, had an opportunity to consult with an adult interested in his welfare; whether the police prevented the juvenile from conferring with a concerned adult; and whether the police frustrated the parent's attempt to confer with the juvenile. G.O., 191 Ill. 2d at 55. Nonetheless, a juvenile's confession should not be suppressed simply because he was denied the opportunity to confer with a parent or other concerned adult before or during the interrogation. G.O., 191 Ill. 2d at 55.

Finally, a defendant's confession will be considered involuntary when the defendant's will was overborne at the time of his confession such that the confession cannot be deemed the product of a rational intellect and a free will. People v. Bowman, 335 Ill. App. 3d 1142, 1153 (2002). " '[P]olice are allowed to play on a suspect's ignorance, fears[,] and anxieties so long as they do not magnify these emotionally charged matters to the point where a rational decision becomes

-18-

impossible.' " Bowman, 335 Ill. App. 3d at 1153, quoting United States v. Rutledge, 900 F.2d 1127, 1130 (7th Cir. 1990). In reviewing whether the defendant's confession was voluntary, we must accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. Nicholas, 218 Ill. 2d at 116. We review de novo the ultimate question of whether the confession was voluntary. Nicholas, 218 Ill. 2d at 116.

In the present case, the totality of the circumstances indicates that the defendant's confession was voluntary. Weighing against admission are the defendant's age and the fact that he had little previous experience with the criminal justice system. The other factors weigh in favor of admission. The trial court found that the defendant was of average intelligence and did not have any mental disabilities. The detention was legal and the duration of the questioning was reasonable. The questioning was commenced in the afternoon and lasted only three or four hours. Numerous breaks were taken. Sergeant Stutz testified that, when filling out the subject data sheet, the defendant described his emotional and physical well-being as good. The defendant was informed of his Miranda rights numerous times and repeatedly indicated that he understood those rights. The defendant was not subjected to any physical punishment. The police did not make any threats or promises.

The defendant contends that his statements were involuntary because they were the result of police trickery. The trial court found that there were three instances of police deception. The police lied to the defendant when they told him that there was (1) satellite imagery showing someone go from the defendant's home to the victim's home on the night of the murder and (2) DNA evidence, matching him, found inside the victim. The police also misled the defendant's father when they told him they wanted to do a routine follow-up interview of the defendant but did not inform him that

they had DNA evidence from the victim's bathroom indicating that the defendant had been present inside the victim's home. While we do not condone Officer Gardner's tactics, the trickery here does not render the defendant's confession involuntary. See People v. Martin, 102 Ill. 2d 412, 427 (1984) (explaining that police deception does not invalidate a confession as a matter of law but rather is only one factor to consider when making a determination of voluntariness). The trial court found that there was no evidence that the deception induced the defendant's confession. We cannot say that this finding was against the manifest weight of the evidence. See Nicholas, 218 Ill. 2d at 116. Officer Gardner testified that, after the defendant was confronted with the false evidence, the defendant became defensive, started yelling and swearing, and asked to go home. Officer Gardner also testified, however, that the defendant did not confess until after he was questioned further about inconsistencies in his answers from previous interviews. The defendant did not testify that the false statements induced his confession. As such, we cannot say that the defendant's inculpatory statements were induced by the false evidence.

The defendant contends that the deception here is similar to that found in Bowman. The Bowman court acknowledged that the State may not extort confessions by deliberate fraud or trickery. Bowman, 335 Ill. App. 3d at 1154. Trickery involves affirmative acts of fraud or deceit. Bowman, 335 Ill. App. 3d at 1154. A defendant's confession must not result from deceptive interrogation tactics calculated to overcome the defendant's free will. Bowman, 335 Ill. App. 3d at 1154. In Bowman, the police learned from the defendant's cellblock mate that the defendant was extremely fearful of returning to the Menard Correctional Center. Bowman, 335 Ill. App. 3d at 1146. As such, the police collaborated with the cellblock mate, offering him leniency on his own illegal behavior, to induce the defendant's confession. Bowman, 335 Ill. App. 3d at 1153.

The cellblock mate thereafter orchestrated a plan to bond out of jail and return to help the defendant escape. Bowman, 335 Ill. App. 3d at 1146. In order to avoid a transfer to Menard until the cellblock mate returned, the defendant accepted the cellblock mate's suggestion to confess to a murder the police were investigating. Bowman, 335 Ill. App. 3d at 1146. According to the escape scheme, the defendant could remain in the county jail while the police investigated the defendant's statements, avoiding a transfer to Menard, until the cellblock mate could be released and return to free the defendant. Bowman, 335 Ill. App. 3d at 1146. The reviewing court held that the police used the cellblock mate to play on the defendant's intense fear of returning to Menard and to induce him to confess. Bowman, 335 Ill. App. 3d at 1154. The reviewing court concluded that the defendant's confession was the result of deceptive interrogation tactics calculated to overcome the defendant's free will at the time of his confession and that the defendant's confession was not the product of a rational intellect. Bowman, 335 Ill. App. 3d at 1154.

In the present case, unlike Bowman, we cannot say that Officer Gardner's interrogation tactics played upon the defendant's ignorance, fears, and anxieties to a point where it was impossible for him to make a rational decision. We acknowledge that the police did not find DNA evidence inside the victim. However, at the time of the interview, the police did possess DNA evidence linking the defendant to the victim's house. The defendant had been questioned several months prior, and inconsistencies between his earlier interviews and his statements made on September 5, 2002, were properly explored by the officers. The overstatement of evidence in this case does not amount to the kind of trickery denounced by the appellate court in Bowman. In Bowman, the police took advantage of the defendant's intense fear of returning to Menard and created an incentive for the defendant to confess. The circumstances in Bowman resulted in a confession of questionable

veracity. In the present case, however, the police did not play on any special fears of the defendant, and the defendant did not have any incentive to confess.

Our determination is supported by People v. Brown, 301 Ill. App. 3d 995 (1998). In Brown, the police subterfuge involved the withholding of information about the true nature of the investigation from the defendant and his mother. Brown, 301 Ill. App. 3d at 1002. The police informed the defendant and his mother that they were investigating garbage can fires. Brown, 301 Ill. App. 3d at 1002. However, the police withheld the fact that an infant had died in one of the fires for which the defendant was being questioned. Brown, 301 Ill. App. 3d at 1002. The defendant ultimately confessed to starting the garbage can fires and was charged, in part, with first-degree murder. Brown, 301 Ill. App. 3d at 997. The defendant filed a motion to suppress his confession. Brown, 301 Ill. App. 3d at 999.

The Brown court noted that "criminal suspects do not have the right to be informed of the specific criminal offense or potential criminal offenses for which they may be charged when questioned by the police." Brown, 301 Ill. App. 3d at 1003. The reviewing court determined that the officers were under no affirmative obligation to disclose the entire scope of their investigation to the defendant and his mother. Brown, 301 Ill. App. 3d at 1003. As such, the reviewing court affirmed the trial court's determination that the defendant's Miranda waiver was made knowingly and voluntarily and was not coerced, nor was the defendant's will overborne. Brown, 301 Ill. App. 3d at 999, 1003.

In one sense, the police subterfuge in the present case is less than that found in Brown. In Brown, the defendant was unaware that the police were investigating the murder of an infant. In the present case, the defendant and his father were aware that the police were investigating the murder

of the victim. Absent from <u>Brown</u>, but present here, is the introduction of false evidence to the defendant. However, as explained above, there was no evidence that the deception induced the defendant's confession. Finally, although the police did not divulge to the defendant's father that the nature of the questioning had changed due to the DNA evidence, the police are under no affirmative obligation to disclose the entire scope of their investigation. See <u>Brown</u>, 301 Ill. App. 3d at 1003.

The defendant also contends that his statements were involuntary because the police frustrated his father's ability to confer with him. We disagree. On September 3, 2002, Minniti gave the police consent to reinterview the defendant. On September 5, 2002, when the officers were on their way to pick the defendant up from school, Officer Gardner left a message on Minniti's cell phone, informing him of their intent to pick up the defendant and take him to the sheriff's office for questioning. During the first break in questioning, Minniti spoke with Officer Gardner and was aware that his son was being questioned. At that point, the defendant had not yet confessed. Minniti did not ask to speak with his son and chose not to go to the police station. As explained previously, the police had no affirmative obligation to disclose that they had DNA evidence indicating that the defendant was inside the victim's home. See <u>Brown</u>, 301 Ill. App. 3d at 1003.

Moreover, there is no <u>per se</u> rule that a juvenile must be afforded the opportunity to consult with a parent or other concerned adult before being interviewed by the police. See <u>G.O.</u>, 191 Ill. 2d at 55. The "concerned adult" factor is particularly relevant in the following situations: "the juvenile has demonstrated trouble understanding the interrogation process, he asks to speak with his parents or another 'concerned adult,' or the police prevent the juvenile's parents from speaking with him." <u>In re G.O.</u>, 191 Ill. 2d at 55. None of those situations is present here. The evidence shows that the defendant did not have trouble understanding his rights and that the police did not prevent Minniti

from speaking with his son. Furthermore, the defendant never asked to speak with his father or an attorney. Although the defendant testified to the contrary at the suppression hearing, the trial court found this testimony incredible, and we defer to the trial court's determination on this issue. See People v. Cunningham, 332 Ill. App. 3d 233, 248 (2002) ("we defer to the trial court's determination of witness credibility"). Officer Gardner, Sergeant Stutz, and Attorney Berlin all testified that the defendant never asked to speak with his father or an attorney.

Finally, the defendant contends that his confession was involuntary because his juvenile officer, Sergeant Stutz, did not affirmatively protect his rights. Specifically, the defendant argues that Sergeant Stutz allowed the other officers to lie about the DNA evidence and satellite imagery and did nothing when the defendant asked to go home. While there is no requirement that a youth officer be present when a minor is questioned, it is a significant factor in the totality-of-the-circumstances analysis. People v. Griffin, 327 Ill. App. 3d 538, 547 (2002). The presence of a youth officer does not per se make a juvenile's confession voluntary. Griffin, 327 Ill. App. 3d at 547.

In Illinois, even when youth officers are present, their role is unclear. Griffin, 327 Ill. App. 3d at 547. One line of cases holds that a youth officer's role is to verify that minors' parents have been notified, ensure that minors have been given Miranda rights, and ensure that minors are properly treated, fed, given access to washroom facilities, allowed to rest, and not coerced in any way. Griffin, 327 Ill. App. 3d at 547; People v. Williams, 324 Ill. App. 3d 419, 429-30 (2001); People v. Kolakowski, 319 Ill. App. 3d 200, 213-14 (2001); People v. Plummer, 306 Ill. App. 3d 574, 588 (1999). Other cases find that a youth officer may not merely be present and remain silent, but must demonstrate an interest in the minors' welfare and affirmatively protect their rights. Griffin, 327 Ill. App. 3d at 547; People v. McDaniel, 326 Ill. App. 3d 771, 785-86 (2001); In re L.L., 295 Ill.

App. 3d 594, 603 (1998); In re J.J.C., 294 Ill. App. 3d 227, 237 (1998). "These cases are fact specific and each case must be evaluated on its particular set of circumstances." Griffin, 327 Ill. App. 3d at 547.

In the present case, in light of the fact that the role of a youth officer is unclear, we cannot say that Sergeant Stutz did not fulfill his duties as a youth officer. Sergeant Stutz was present when Officer Gardner notified Minniti that the police would be questioning the defendant. Sergeant Stutz explained the Miranda rights to the defendant and ensured that he understood them. He explained his role as a juvenile officer and indicated that he would be present on the defendant's behalf and would answer any questions for the defendant. The trial court found that Sergeant Stutz's presence was likely the reason that frequent breaks were taken and the defendant was offered food and drink.

Although Sergeant Stutz did not interrupt the interview when the defendant was presented with false evidence, Sergeant Stutz did not actively investigate the defendant's case or work against the defendant's interests. See In re L.L., 295 Ill. App. 3d at 603 (a youth officer cannot be adversarial or antagonistic toward the juvenile). The defendant argues that Sergeant Stutz worked against his interests when, after the defendant asked to go home, Sergeant Stutz told the defendant that "it was probable" that he was not going home that night. However, we cannot say that this created an atmosphere so coercive as to render the defendant's confession involuntary. See Cunningham, 332 Ill. App. 3d at 243 (the key is whether the absence of an adult interested in the defendant's welfare contributed to the coercive circumstances surrounding the interrogation). The defendant was not subjected to physical punishment, and the police did not make threats or promises to the defendant. As such, in light of the totality of the circumstances, it is apparent that the defendant's statements

were made freely and without compulsion.  See McDaniel, 326 Ill. App. 3d at 781.  The trial court therefore did not err in denying the defendant's motion to suppress his statements.

We now address the defendant's argument that he is entitled to additional days of sentencing credit.  "A defendant has a right to one day of credit for each day (or portion thereof) that he spends in custody prior to sentencing."  People v. Whitmore, 313 Ill. App. 3d 117, 120 (2000); see 730 ILCS 5/5--8--7(b) (West 2004).  On that basis, the defendant claims that he deserves 818 days' credit, rather than the 751 days' credit that the trial court awarded him.  The State confesses error, and the record confirms the error.  Accordingly, the mittimus is corrected to reflect that the defendant is entitled to 818 days' credit for time spent in custody prior to sentencing.

### III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed as modified.

Affirmed as modified.

BYRNE, J., concurs.

JUSTICE KAPALA, dissenting:

Because I do not believe that this court has appellate jurisdiction, I respectfully dissent from the majority's opinion holding otherwise.  In noncapital criminal cases, an appeal is perfected by the timely filing of a notice of appeal, and it is this step that vests the appellate court with jurisdiction. 188 Ill. 2d R. 606(a).  The appellate court has no discretion to extend its jurisdiction.  People v. Scruggs, 161 Ill. App. 3d 468, 470 (1987).  "The appellate court's power 'attaches only upon compliance with the rules governing appeals.'"  People v. Lyles, 217 Ill. 2d 210, 216 (2005), quoting People v. Flowers, 208 Ill. 2d 291, 308 (2003).

Supreme Court Rule 606(b) provides in pertinent part:

"Except as provided in Rule 604(d), the notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from or if a motion directed against the judgment is timely filed, within 30 days after the entry of the order disposing of the motion."  188 Ill. 2d R. 606(b).

Thus, in a criminal case where a final judgment is entered after a defendant is found guilty and sentenced, there are two alternative methods to invoke this court's appellate jurisdiction: (1) the filing of a timely notice of appeal after entry of the final judgment; or (2) the filing of a timely notice of appeal after the trial court enters its order disposing of a timely postjudgment motion.  In this case, defendant did not invoke our appellate jurisdiction in either manner.

The trial court entered a final judgment when defendant was sentenced on November 30, 2004.  See People v. Caballero, 102 Ill. 2d 23, 51 (1984) (the final judgment in a criminal case is the sentence).  No notice of appeal was filed within 30 days of that final judgment.  Accordingly, defendant did not invoke our appellate jurisdiction under the first Rule 606(b) method.    W i t h regard to the second Rule 606(b) method of invoking our appellate jurisdiction, on January 7, 2005, the trial court granted defendant leave to file his untimely motion to reconsider sentence and proceeded to deny that motion. On the same date, defendant filed a notice of appeal.  However, the motion to reconsider sentence was not timely and, therefore, defendant did not file a notice of appeal within 30 days of an order disposing of a timely motion directed against the judgment.  The trial court's January 7, 2005, order granting defendant leave to file his motion to reconsider sentence did not render that motion timely. The trial court has the inherent authority, upon proper application and showing of good cause, to grant an extension of time for filing a motion to reconsider sentence.

People v. Church, 334 Ill. App. 3d 607, 613 (2002). However, the trial court must extend the time for filing postjudgment motions before the time to file such motions runs. Lowenthal v. McDonald, 367 Ill. App. 3d 919, 922 (2006) ("If the initial 30-day period or any period of extension expires without the entry of an order setting a new deadline, the trial court loses jurisdiction over the case"); In re Estate of Kunsch, 342 Ill. App. 3d 552, 554-55 (2003). The trial court's jurisdiction to alter a sentence ends after 30 days. Flowers, 208 Ill. 2d at 303. Therefore, defendant did not invoke our appellate jurisdiction under the second Rule 606(b) method.

The majority follows authorities that with little or no analysis presume that if the trial court was revested with jurisdiction to hear a postjudgment motion then a notice of appeal within 30 days of an order disposing of such a motion vests this court with appellate jurisdiction. Although adherence to these cases is understandable, in my view the presumption is unsound.

The revestment doctrine is a practical device that allows the trial court to vacate its final judgment after it loses jurisdiction over a cause, in order to remedy a judgment that the parties agree is unjust or improper without going through the appellate process. Under such circumstances, the revested trial court grants the motion attacking its judgment, the judgment is vacated, and a new final judgment is ultimately entered either by agreement or through the adversary process. This new judgment would be appealable, and an appeal from that new judgment could be taken within 30 days pursuant to Rule 606(b). In my view, the doctrine of revestment offers a chance at another final appealable order; it does not allow an untimely postjudgment motion to extend the time to appeal the original final judgment.

In this case, I do not believe that the trial court was revested with jurisdiction, because although the State did not object to the trial court hearing the untimely postjudgment motion, the

proceedings were not, as the revestment doctrine requires, inconsistent with the merits of the prior judgment, that is, the sentence entered on November 30, 2004. Rather, the issue at the proceedings on defendant's untimely postjudgment motion to reconsider sentence was whether the trial court should vacate the sentence and conduct a new sentencing hearing, which would result in a new judgment. The State argued that the sentence was appropriate and should remain intact. These proceedings were not inconsistent with the merits of the prior judgment. See Sears, 85 Ill. 2d at 260 ("The hearing on Gerald's motion did not concern the merits of the judgment; the participants did not ignore the judgment and start to retry the case, thereby implying by their conduct their consent to having the judgment set aside. On the contrary, the hearing was about whether the judgment should be set aside; and Conde insisted that it should not. Nothing in the proceeding was inconsistent with the judgment").

Nevertheless, even assuming that revestment occurred in this case, we still lack appellate jurisdiction. Despite the presumptions made in previous decisions of the appellate court, I do not believe that the question of appellate court jurisdiction is answered solely by finding that the trial court was revested with jurisdiction. Supreme Court Rule 606(b) allows an appeal of a final judgment only within 30 days after the entry of the final judgment or within 30 days after an order disposing of any timely filed postjudgment motions. However, simply because the trial court has jurisdiction to decide a postjudgment motion does not mean the motion tolls the time to appeal. Cases have held that although the trial court may have jurisdiction to rule on a successive postjudgment motion, the motion does not extend the time to appeal. See Sears, 85 Ill. 2d at 259; People v. Serio, 357 Ill. App. 3d 806, 816-17 (2005). To the extent that any previous appellate court

cases presume that appellate jurisdiction automatically flows from the denial of an untimely postjudgment motion by a trial court revested with jurisdiction, I disagree.

Illustrative of the faulty presumption is <u>MacArthur</u>, where this court states that there is an exception to the timeliness requirement of Rule 606(b) but provides no authority for the concept and does not engage in further analysis of the issue. Instead, like many other appellate court cases, <u>MacArthur</u> incorrectly assumes that appellate jurisdiction derives from trial court jurisdiction. I do not believe that the appellate court can create a common-law exception to the timeliness requirement of Rule 606(b), as we clearly do not have the power to excuse noncompliance with our supreme court's rules (<u>Lyles</u>, 217 Ill. 2d at 216 (appellate court does not have the authority to excuse compliance with filing requirements of the supreme court rules governing appeals); <u>Flowers</u>, 208 Ill. 2d at 308-09).

In this case, the trial court denied the motion to reconsider the sentence, leaving the original November 30, 2004, final judgment intact. Pursuant to our supreme court's holding in <u>Sears</u>, the denial of a postjudgment motion is not itself a final judgment or an appealable order. <u>Sears</u>, 85 Ill. 2d at 258. Therefore, even if the trial court in this case was revested with jurisdiction to rule on defendant's motion to reconsider sentence, the order denying the motion was not an appealable judgment. Consequently, we do not need to decide if revestment occurred in this case because, even if revestment occurred, defendant's postjudgment motion did not toll the time to appeal. Thus, the notice of appeal defendant filed on January 7, 2005, from the trial court's order of the same date did not confer appellate jurisdiction on this court. For these reasons, I respectfully dissent and would dismiss defendant's appeal.